**UNITED STATES of America,**
**Appellee,**

v.

**TIN YAT CHIN, aka Tan C. Dau,**
**Defendant–Appellant.**

**Docket No. 03–1621.**

United States Court of Appeals,
Second Circuit.

Argued: April 21, 2004.

Decided: June 2, 2004.

Brendan White (Diarmuid White, of counsel), White & White, New York, NY, for Defendant–Appellant.

Margo K. Brodie, Assistant United States Attorney (Peter A. Norling, Lara Treinis Gatz, Assistant United States Attorneys, of counsel), for Roslynn R. Mauskopf, United States Attorneys Office for the Eastern District of New York, Brooklyn, NY, for Appellee.

Before: McLAUGHLIN, SACK, SOTOMAYOR, Circuit Judges.

MCLAUGHLIN, Circuit Judge.

Tin Yat Chin was convicted of one count of impersonating a federal officer and three counts of tax evasion after a jury trial in the United States District Court for the Eastern District of New York (Gershon, *J.*). To support his claim that he was misidentified before and at trial, Tin Yat Chin proffered: (1) customer copies of credit card transaction receipts as part of an alibi notice; and (2) the testimony of a language expert that Tin Yat Chin, a native Cantonese speaker, could not have faked the Mandarin accent attributed to the impersonator by Government witnesses. The district court excluded the receipts as unauthenticated under Fed. R.Evid. 901; and it limited the expert testimony to the linguistic differences between Cantonese and Mandarin and the expert's opinion that Tin Yat Chin is a native Cantonese speaker.

On appeal, Tin Yat Chin contends that the receipts were authenticated and admissible, and that the district court's limitation on his language expert's testimony was an abuse of discretion. We agree, in part. Specifically, we hold that: (1) the receipts were authenticated and admissible as non-hearsay, and the erroneous exclusion was *not* harmless; but (2) the limitation on the expert testimony was proper. Based on the district court's exclusion of the receipts, we vacate Tin Yat Chin's conviction and remand for a new trial.

## BACKGROUND

### A. *Facts*

Between 1997 and 1999, a swindler, simultaneously impersonating both an immigration lawyer and an officer of the Immigration and Naturalization Service ("INS"), promised Chinese immigrants work visas for their foreign relatives in exchange for cash payments. Primarily

through intermediaries, the swindler collected various documents and information from victims, prepared written contracts, and provided receipts for the payments, but he never produced a visa for any of his victims.

In 1997, the swindler rented an apartment from Sui Seng Wong, on 86th Street in Brooklyn, New York, under the pseudonym "Qing Zhao." In furtherance of the scheme, he opened an office, hiring Lai Fan Lok Lao as a secretary to answer the telephone, accept cash payments, write receipts, and collect documents from the victims. Using another pseudonym, "Mok Wah," the swindler promised Chinese immigrants visas in exchange for about $30,000 each. He usually demanded half the money in advance.

The following year, the swindler closed the 86th Street office and disappeared with his victims' payments. Then, using yet another pseudonym, "Jun Li," he rented an apartment on Fourth Avenue in Brooklyn from Lolita Eng, who testified that: (1) her tenant held a copy of the lease in an unusual manner (the purpose of which the Government claims was designed to avoid leaving his fingerprints on the document); and (2) he rented month-to-month and paid her by money order.

At the Fourth Avenue location, the swindler established a new office, "Mei Dong Immigration Service," where he used the pseudonym "Tan C. Dau." The swindler retained Wan Yi Li as his secretary to prepare form contracts, provide receipts for cash payments, and translate Cantonese. According to the testimony of Wan Yi Li and numerous victims, the swindler spoke Chinese, primarily in the Mandarin dialect, but occasionally in Cantonese with a Mandarin accent.

In June 1999, Wan Yi Li accompanied the swindler to China, where she acted as a translator and escorted customers to the Chinese consulate. One of the victims, Chau Hoang Dang, who had already paid the swindler tens of thousands of dollars, also went to China to meet the swindler. In July, Wan Yi Li brought Chau Hoang Dang to a hotel to meet the swindler. In Wan Yi Li's presence, the swindler demanded that Chau Hoang Dang pay an additional $150,000 or else her relatives would not get their visas. He also threatened to hire someone to murder Chau Hoang Dang on her return to New York if she failed to produce the cash within two weeks.

Wan Yi Li returned from China in August. By this time, the swindler had closed his Fourth Avenue office and disconnected his beeper.

In 2001, Tin Yat Chin was arrested as the suspected swindler. Chau Hoang Dang and other witnesses identified Tin Yat Chin as the swindler. Tin Yat Chin acknowledged the potential existence of a swindler, but claimed that he had been misidentified by a group of victims desperate to recover their money or to minimize their own criminal liability for participating in a scheme with the swindler to bribe Chinese immigration officials.

The Government indicted Tin Yat Chin for: (1) one count of impersonating a federal employee (of the INS), in violation of 18 U.S.C. § 912; and (2) three counts of tax evasion for failing to declare his illegally acquired payments as income in 1997, 1998, and 1999, in violation of 26 U.S.C. § 7201.

In January 2003, following a jury trial, Tin Yat Chin was convicted on all four counts. He was sentenced to 120 months' imprisonment, three years' supervised release, a $400 special assessment, and $653,450 in restitution. The district court declined to "group" the four counts and enhanced Tin Yat Chin's sentence for vari-

ous reasons, including "sophisticated concealment" on the tax evasion counts.

### B. *Procedural History*

Twenty-seven witnesses, primarily victims and their relatives and others with business connections to the swindler, testified at trial. Eleven victims and their relatives identified Tin Yat Chin as the swindler. However, two of these witnesses admitted that, before picking Tin Yat Chin out of a photo array, they had viewed a photograph of him that appeared in a November 2001 newspaper article about the immigration scheme. Two other victims who had limited or no contact with the swindler were unable to identify Tin Yat Chin. The daughter of one of the victims, who was ten years old when she saw the swindler, selected Tin Yat Chin from a photo array, but was unable to identify him at trial. At trial, another victim misidentified a Deputy United States Marshal as the swindler.

Tin Yat Chin was also identified by Wan Yi Li, who worked as his secretary for almost a year, and by Eng, his landlady at the Fourth Avenue apartment. Eng's contact with the swindler was limited, however. The swindler's first landlord, Sui Seng Wong, identified Tin Yat Chin with difficulty from a photo array, but was unable to confirm her identification in court.

Based on perceived weaknesses in the witnesses' identifications at trial, Tin Yat Chin energetically pressed his central defense theory: misidentification.

### 1. *Exclusion of the Credit Card Receipts*

Before trial, the Government alleged that between June and August 1999, Tin Yat Chin traveled in China under the pseudonym "Tan C. Dau." The Government also noted that Tin Yat Chin had been unemployed between 1997 and 1999.[1] Tin Yat Chin responded with an alibi notice and moved *in limine* to admit into evidence copies of credit card transaction receipts, allegedly bearing his signature, showing that he was in a Queens, New York, P.C. Richard & Sons store and a Queens Key Food supermarket at the time Government witnesses would testify that he was in China. A collection of receipts, including the P.C. Richard's receipt, dated July 7, and the Key Food receipts, dated July 8, 10, and 26, were produced by Tin Yat Chin's wife while Tin Yat Chin was detained in a federal correctional facility pending trial. At the time of his arrest, Tin Yat Chin had on his person a September 2001 Key Food receipt similar to the ones from July 1999.

Tin Yat Chin and his wife are joint holders of the credit cards at issue. Both the merchants and the credit card companies routinely destroyed their copies of the receipts eighteen months after the relevant purchases in accordance with standard industry practice. Tin Yat Chin, however, proffered that: (1) his wife would testify that she had not made the purchases in question; (2) the store managers would testify about how the customer receipts were produced, including that: (a) the terminal generated a two-part credit card transaction slip which the customer had to sign to complete the transaction; and (b) the merchant's (white) copy contains the customer's ink signature and the customer's (yellow) copy contains an impression of the customer's signature; and,

---

[1] Tin Yat Chin was terminated from his position as an INS immigration inspector in 1994 after pleading guilty to extortion for demanding and receiving money from Chinese visitors who wished to remain in the United States. *See Tin Yat Chin v. Dep't of Justice*, 95 F.3d 1167, No. 96–3176, 1996 WL 457195, 1996 U.S.App. Lexis, 41443 (Fed.Cir. Aug.13, 1996) *(per curiam )* (unpublished). This fact, however, was not disclosed to the jury.

finally, (3) a handwriting expert would testify that Tin Yat Chin's signatures on the yellow receipts were genuine.

Trolling the Federal Rules of Evidence, Tin Yat Chin argued that the receipts were admissible as (1) non-hearsay or, in the alternative, as (2) "business records" (Fed.R.Evid.803); (3) "duplicates" (Fed. R.Evid.1003); *or* (4) under the "residual" hearsay exception (Fed.R.Evid.807). However, the district court excluded the receipts as unauthenticated under Fed. R.Evid. 901 and therefore refused to admit them under any other evidentiary rationale.

Specifically, the court held that "[Tin Yat Chin's] proffer fail[s] to provide a rational basis for concluding that the receipts are in fact customer copies of records of purchases made on particular dates at particular stores by [Tin Yat Chin]." *United States v. Tin Yat Chin*, 288 F.Supp.2d 240, 241 (E.D.N.Y.2003). The court appeared to question the authenticity of the receipts in general, but emphasized, in particular, that "[Tin Yat Chin] offers no evidence by any witness or any document that can establish that ... his signature was placed on them at the time and place he proffers." *Id.* at 241–42. Therefore, Tin Yat Chin was not permitted to introduce the credit card receipts to show that he was in Queens at the time the Government said he was in China.

### 2. *The Language Expert's Testimony*

The victims of the immigration fraud generally described the swindler as speaking in Mandarin or in Cantonese with a Mandarin accent. One victim even testified that she could "tell [the swindler] was a Mandarin speaker who was trying to speak Cantonese." Moreover, Wan Yi Li, the swindler's second secretary, testified that the swindler hired her to translate Cantonese. Finally, Tin Yat Chin's brother confirmed that Tin Yat Chin was a native Cantonese speaker, with limited Mandarin skills, which he acquired from a single college language course.

In support of his misidentification defense, Tin Yat Chin offered a report prepared by a linguist, Julie Tay, which concluded that it would be "extremely difficult" for Tin Yat Chin to fake a Mandarin accent. Based on her report and accompanying testimony, Tin Yat Chin proposed to argue to the jury that because he could not have faked the Mandarin accent attributed to the swindler, he had been misidentified.

The district court held a pre-trial hearing to determine whether Tay's expert testimony was admissible under Fed.R.Evid. 702. The court inquired into her qualifications and the basis for her conclusions.

Tay is fluent in English, Cantonese, and Mandarin. She holds a B.A. in linguistics and anthropology and an M.A. in anthropology, and she teaches Mandarin and Cantonese at the Wossing Center for Chinese in Chinatown, New York City. As Executive Director of the Wossing Center, she assesses the dialect and accent abilities of students and prospective instructors. Her professed expertise on whether an individual could fake an accent is based on her "studies of social linguistics" and "language acquisition" from which she determined that, except for "scripted" conversations, one cannot "discard" an "integral part of the overall speech habit," such as an accent, without significant "deliberate practice."

When the court asked whether there was any literature concerning deliberate acquisition of an accent, Tay responded that the "salient" literature was "black English." Tay derived her conclusions mainly from "everyday experience" and from her vague recollections of her studies of

linguistics in the 1980's, including "the Nigerian situation" and "Mongolianism in India."

Her conclusion about Tin Yat Chin's inability to fake a Mandarin accent was based on: (1) an interview with Tin Yat Chin's brother and a twenty-five minute conversation in Cantonese with Tin Yat Chin, during which he spoke for only fifteen seconds in Mandarin; (2) the dearth of Mandarin schools in the United States in the 1950s and 1960s, thus minimizing the likelihood that Tin Yat Chin had formally studied Mandarin; and (3) the impossibility of acquiring a Mandarin accent through self-study.

The court allowed Tay to testify as an expert, but limited her testimony to: (1) "the differences between Cantonese and Mandarin"; and (2) her opinion that "when she spoke with Mr. Chin he sounded to her as if he were a native Cantonese speaker."

The court held that generalized assumptions about the accessibility of Mandarin studies in the 1950s and 1960s did not satisfy Rule 702's standards for validity, and a fifteen-second conversation in Mandarin was inadequate to satisfy Rule 702's requirement that the testimony rest on sufficient data. The court also held that, based on general information and literature with which she was admittedly unfamiliar, Tay was not qualified to determine whether a particular individual could deliberately fake a Mandarin accent.

Tin Yat Chin now appeals his conviction and sentence.

## DISCUSSION

As detailed below, we hold as follows: the copies of the receipts satisfy the authentication requirements of Rule 901, are admissible as non-hearsay, and their exclusion was not harmless error. The district court's limitation of Tay's testimony was not an abuse of discretion. On remand, however, Tin Yat Chin may fortify his proffer of Tay's testimony in a manner that addresses the district court's concerns.

### A. The Credit Card Receipts

#### 1. Authentication

The Government concedes, as it must, that Tin Yat Chin offered compelling circumstantial evidence that the receipts were generated at the times and places designated on the receipts. Thus, the parties have narrowed their authenticity dispute down to whether Tin Yat Chin himself signed the receipts at the times and places indicated. There may be questions about the ultimate *reliability* of the receipts as proof of Tin Yat Chin's alibi, but the district court applied an unreasonably high standard for their *authentication* under Rule 901.

■ A district court has broad discretion to determine whether a piece of evidence has been properly authenticated. *United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir.2001).

■ Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R.Evid. 901(a). Rule 901 "does not erect a particularly high hurdle," and that hurdle may be cleared by "circumstantial evidence." *United States v. Dhinsa*, 243 F.3d 635, 658–59 (2d Cir.2001) (internal citation and quotation marks omitted). The proponent is not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir.1999) (internal citation and quotation marks

omitted). Rule 901's requirements are satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Id.* (internal citation and quotations omitted).

Once Rule 901's requirements are satisfied, " 'the evidence's persuasive force is left to the jury.' " *Dhinsa,* 243 F.3d at 658 (quoting *United States v. Ortiz,* 966 F.2d 707, 716 (1st Cir.1992)); *see also Tropeano,* 252 F.3d at 661 ("Authentication of course merely renders [evidence] admissible, leaving the issue of . . . ultimate reliability to the jury."). As we recently explained in *SCS Communications, Inc. v. The Herrick Co.,* 360 F.3d 329, 344–45 (2d Cir.2004), the other party then remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the *weight* of the evidence— not to its *admissibility.*

■ The evidence that the receipts were signed by Tin Yat Chin at the times and places where they were generated is contradicted by testimony of Government witnesses who place him in China in July 1999. Another person, such as Tin Yat Chin's wife, a co-holder of the credit card, may have signed the originals which, having been destroyed, can no longer be compared to the copies bearing Tin Yat Chin's signature. Alternatively, store employees may have permitted Tin Yat Chin's wife either to complete the transactions without a signature or to separate the yellow copies and affix her signature to the merchant's copy, allowing her husband to sign the customer copies at a later date. These doubts about the ultimate reliability of the receipts, however, do not justify their exclusion under Rule 901's minimal standards for authentication.

The combined proffered testimony of: (1) Tin Yat Chin's wife (that she had not made the purchases), (2) the store managers (regarding their transaction practices), and (3) a handwriting expert (identifying Tin Yat Chin's signature) was sufficient to satisfy Rule 901's authentication requirements.

The district court also questioned, in particular, the authenticity of the July 7, 1999, P.C. Richard & Sons receipt. The accompanying charge card receipt lacked a date, and "[m]ost significantly, the expiration date of the charge card imprinted on the . . . sales slip is '11/99,' but the expiration date handwritten on the charge card receipt bearing defendant's signature is '9/00.' " *Tin Yat Chin,* 288 F.Supp.2d at 243. Because the discrepancy between expiration dates was not raised by the Government or the district court during pretrial argument on the motion *in limine,* Tin Yat Chin had no opportunity to explain it. In any event, these discrepancies alone—which may have been explained as a clerical error—do not alter our conclusions about the admissibility of the P.C. Richard & Sons receipt, nor are they relevant to the July 8, 10, and 26, Key Food receipts.

### 2. *Admissibility As Non–Hearsay*

■ When a category of writings does not trigger the traditional reliability concerns of hearsay—defects in memory, perception, narration, or sincerity—we have sanctioned their admissibility as "non-hearsay." *See United States v. Saint Prix,* 672 F.2d 1077, 1083–84 (2d Cir.1982)(affirming admissibility of sales receipts for vans "to prove that someone using [defendant's] name bought the vans, from which the jury could infer that the person using [defendant's] name was [defendant] himself"); *United States v. Lieberman,* 637 F.2d 95, 101 (2d Cir.1980)

(finding a hotel registration card signed by guests admissible "to show that someone calling himself Robert D'Ambra registered in the hotel laying a foundation for further evidence that from his room a call was made to [defendant's] unpublished telephone number" (internal citation omitted)); *United States v. Mejias,* 552 F.2d 435, 446 (2d Cir.1977) (affirming admissibility of motel receipt, luggage store invoice, and travel agency business card, all of which were in the defendant's possession when he was arrested, as circumstantial evidence of his presence at a motel).

In all of these cases, the writings were admitted as non-hearsay to prove a fact *against* the defendant. The same principle applies in the reverse situation, where the writings are favorable to the accused. The jury has only to decide the genuineness of the receipts from which it may then infer that Tin Yat Chin was not in China. Put another way, a person who was not named "Tin Yat Chin" would be less likely to possess a receipt with that name upon it than a person having that name.

The Government and the district court all but concede that, had the receipts been authenticated, they would have been admissible as non-hearsay. They tended to show that a person referring to himself as "Tin Yat Chin" signed receipts on the dates and times in question, laying a foundation for the testimony of Tin Yat Chin's wife, store managers, and a handwriting expert to support Tin Yat Chin's alibi.

3. *Harmless Error Analysis*

■ The Government contends that even if the receipts were admissible, their exclusion was harmless error. We disagree.

■ In the absence of a constitutional violation, erroneous exclusions of evidence are subject to the harmless error test of Fed.R.Crim.P. 52(a). *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (a non-constitutional error is harmless where an appellate court has a fair assurance that the error did not substantially affect the verdict); *see also United States v. Reindeau,* 947 F.2d 32, 36 (2d Cir.1991)(error was not harmless where restrictions on cross-examination of prosecution's explosives expert effectively precluded defense theory that device was not designed for a destructive purpose).

The admitted evidence showing that Tin Yat Chin was in China in the summer of 1999, a linchpin of the Government's case, was exclusively testimonial. There were no passports or other immigration documents, airline tickets, or receipts for foreign purchases, introduced into evidence. The defense assailed the witnesses as incredible because: (1) the victims and their relatives were either unreliable, influenced by other relative-witnesses, or seeking a financial recovery; and (2) the swindler's business associates sought to minimize their own culpability for participation in the immigration scheme. Not surprisingly, Tin Yat Chin's interpretation of the receipts, *if credited by the jury,* would have established his misidentification defense.

Against this backdrop, the jury could have found the receipts reliable evidence that placed Tin Yat Chin in Queens when the Government said that he was in China. The jury might have arrived at this conclusion, either without, or in conjunction with, the defense's claim that Tin Yat Chin lacked the Mandarin language abilities or accent of the swindler. Therefore, we lack confidence that the verdict was not substantially affected by the district court's exclusion of the receipts.

In summary: (1) the receipts were (a) authenticated under Rule 901; and (b) admissible as non-hearsay; and (2) their exclusion was not harmless error. On remand, the district court should admit the receipts into evidence with an appropriate instruction on the jury's role in deciding their ultimate reliability.

### B. *Inadequate Proffer of Expert Testimony*

Tin Yat Chin also contends that the district court's limitation on Tay's expert testimony was an unreasonable application of Fed.R.Evid. 702. We disagree, but Tin Yat Chin is permitted on remand to fortify his proffer to establish, if possible, the admissibility of Tay's previously excluded testimony.

■ We review a district court's evidentiary rulings under an abuse of discretion standard. *See United States v. Taubman*, 297 F.3d 161, 164 (2d Cir.2002). A judge has not abused her discretion merely because we would have disagreed with her in the first instance. *Id.* Admission of expert testimony under Rule 702 will be reversed only for manifest error. *United States v. Schatzle*, 901 F.2d 252, 257 (2d Cir.1990).

Rule 702 requires that expert testimony be: (1) "based upon sufficient facts or data"; (2) "the product of reliable principles and methods"; and (3) "applied ... reliably to the facts of the case." Fed. R.Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 & n. 7, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)(holding that pursuant to the trial judge's "gatekeeping responsibility," she "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable").

To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony. *See United States v. Diallo*, 40 F.3d 32, 34 (2d Cir.1994).

■ The district court held that a fifteen-second portion of a twenty-five minute conversation, in conjunction with general assumptions about a native Cantonese speaker's exposure to Mandarin in the 1950s and 1960s, were not "sufficient facts or data" for Tay to determine whether Tin Yat Chin could fake a Mandarin accent. The court also ruled that because Tay was admittedly not familiar with the literature she cited, Tay was not in a position to reliably determine the difficulty of faking an accent.

Tin Yat Chin does not claim that he lacks some degree of proficiency in Mandarin, but argues that as a native Cantonese speaker he could not have faked a Mandarin accent. Therefore, defense counsel should have proffered a more extensive dialogue with Tin Yat Chin in Mandarin. His mid-conversation lapse into Cantonese or his refusal otherwise to participate in a Mandarin dialogue cannot excuse compliance with Rule 702.

While we do not suggest that a brief conversation is *per se* insufficient, we note that the facts of this case required further investigation. First, Tin Yat Chin may have had an incentive to minimize or avoid a Mandarin dialogue to support his defense. Second, there were third parties, such as Tin Yat Chin's former INS coworkers, who witnessed first-hand Tin Yat Chin's dialogues in Mandarin. Therefore, Tay's heavy reliance on her fifteen-second Mandarin dialogue with Tin Yat Chin to the exclusion of other significant data was not sound under the circumstances.

For similar reasons, the district court had legitimate concerns about Tay's "principles and methods." Not only was the

conversation in Mandarin brief and over-emphasized, but the linguistics literature, although relevant, appears to have an attenuated and indirect relation to her proffered testimony. While we decline to impose a standard that necessarily excludes such literature—particularly in the absence of a superior alternative—the district court was correct to require Tay to have adequate familiarity with it before qualifying her as an expert.

Although the district court's limitation was proper, we note that on remand Tin Yat Chin may submit a revised proffer addressing the court's Rule 702 concerns. We express no opinion on the extent to which the district court is required to admit the previously excluded expert testimony.

### C. Sentencing Considerations

Tin Yat Chin alleges two errors in his sentence: (1) the impersonation and tax evasion counts were not "grouped," thereby resulting in a higher offense level; and (2) an enhancement for "sophisticated concealment" on the tax evasion counts was improper. Because we remand for a new trial, we need not resolve Tin Yat Chin's sentencing claims on this appeal. However, these issues were briefed and may recur, so we briefly address them.

Neither we, nor our sister circuits, have decided this specific grouping issue. Both logic and analogy, however, seem to dictate that impersonation and tax evasion counts should be grouped under United States Sentencing Guidelines § 3D1.2(d). *See United States v. Petrillo*, 237 F.3d 119, 124–25 (2d Cir.2000)(mail fraud and tax evasion counts are grouped because both offenses are frauds, part of a single continuous course of criminal activity involving the same funds, and trigger substantially identical offense level increments based on the amount of loss), *abrogated on other* grounds, *Crawford v. Washington*, —— U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *United States v. Gordon*, 291 F.3d 181, 192–93 (2d Cir.2002) (reaffirming *Petrillo* and requiring grouping of tax evasion and mail fraud counts under subsection (d) of § 3D1.2), *cert. denied*, 537 U.S. 1114, 123 S.Ct. 866, 154 L.Ed.2d 788 (2003).

In rejecting grouping, the district court cited the impersonation's "distinctly different harm[ ]" (presumably non-economic reputational harm to the Government). But Tin Yat Chin was sentenced under the Guideline that cites the "amount of loss" as one of "the primary factors upon which the guideline is based." *See* U.S.S.G. § 2F1.1 (repealed and consolidated with § 2B1.1, effective November 2001). Because the Guideline measures, in monetary terms, the harms imposed by fraud and, in this case impersonation, we find the district court's distinction problematic.

The district court also imposed a two-level enhancement for "sophisticated concealment" on the tax evasion counts. Under Guideline § 2T1.1(b)(2), a tax evasion defendant should receive a two-level enhancement for "*especially* complex or *especially* intricate offense conduct in which deliberate steps are taken to make the offense, or its extent, difficult to detect." *See* U.S.S.G. § 2T1.1(b)(2) (Comment., n. 4) (emphasis added); *see, e.g., United States v. Middlemiss*, 217 F.3d 112, 124 (2d Cir.2000) (affirming enhancement where defendant listed stocks in wife's maiden name, created extensive false paper trail of corporate documents, and accepted only cash payments); *United States v. Lewis*, 93 F.3d 1075 (2d Cir.1996)(affirming enhancement where defendant issued 178 personal checks to 26 fictitious entities which, in turn, redirected the untaxed cash to his personal expense account).

42

Here, the swindler used four fictitious identities, established two separate offices, limited his contacts with the victims, and accepted only cash payments. While the *impersonation* offense may have involved "sophisticated means," U.S.S.G. § 2B1.1(b)(8)(C), we see no especially intricate or complex steps to evade taxes.

Had we affirmed Tin Yat Chin's conviction, our inclination would have been to vacate his sentence and remand for grouping and for omission of the enhancement. We will revisit these issues when and if raised on a future appeal.

## CONCLUSION

For the foregoing reasons, we VACATE Tin Yat Chin's conviction and REMAND for a new trial with instructions to: (1) admit the credit card receipts into evidence accompanied by an appropriate instruction on the jury's role in determining their ultimate reliability; and (2) entertain a renewed proffer of Tay's expert testimony.