# IN THE COURT OF APPEALS OF IOWA

No. 17-1757
Filed August 15, 2018

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**DEREK CHRISTOPHER MILLS,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Warren County, Kevin A. Parker, District Associate Judge.

A defendant appeals his conviction for criminal mischief in the fourth degree. **REVERSED AND REMANDED.**

Susan R. Stockdale, Windsor Heights, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**TABOR, Judge.**

Overnight, E.S. missed nineteen calls from a blocked number and received a profane text message she attributed to her ex-boyfriend. The next morning on her way to work, E.S. discovered her tire had been slashed. Returning to her driveway, she saw a tire on her housemate's truck had also been punctured. After hearing evidence connecting Derek Mills to the incident, a jury convicted him of criminal mischief in the fourth degree. On appeal, Mills contends the district court improperly allowed five prosecution exhibits into evidence over his authentication and hearsay objections. He further argues his trial counsel's performance fell below professional norms when counsel did not object to other hearsay evidence. Mills also alleges counsel should have objected to testimony from State's witnesses who insinuated Mills was responsible for the tire damage. Because three of the challenged exhibits were improperly admitted and their admission was not harmless, we reverse the conviction and remand for a new trial.

## I.       Facts and Prior Proceedings

In July 2016, E.S. met Derek Mills at the Lucky Gal Tattoo shop where he "did a piercing" for her. Except he told her his name was Derek Wright. E.S. and Mills dated for about two months; during that time E.S. never visited Mills's home, but he came to her place. In early September 2016, E.S. allowed Matt, her brother's friend, to stay with her because he "didn't have anywhere to go." Mills was "not happy" with the arrangement. E.S. told the jury that Mills "got jealous, and ended up telling me that he was coming over."

E.S. testified she was sleeping the night of September 12, 2016, when she missed multiple calls from a blocked number and a text message she believed to

be from Mills saying: "Fuck you!!!! I CAME here for you!! this is how you treat the one man that loved you! Fuck you!! @ you said you loved me!! Lying bitch.!!!" E.S. didn't read the text until the next morning, when she answered, "Okay I suggest you never text or call me again. Psycho."

E.S. then got ready for work, loaded her six-year-old daughter into the car, and started to drive off—just before the light signaling low tire pressure appeared on her dashboard. E.S. hoped the car's sensor was just being overly sensitive, but she found her tire was "completely flat." As she pulled back into her driveway, E.S. looked over and saw a tire on Matt's truck had been "slashed as well."

E.S. sent two more text messages to Mills: "Did you slash my mother fucking tire?" and "I will be at your work today." To which Mills answered: "First that wasn't me at all…lol I would never waist [sic] my time knowing you moved on… 2nd I was sleeping so say or do whatever…oh yea I don't work today." E.S. then called the police to report the slashed tires.

Carlisle police detective Dave Larson spoke with Mills on the telephone a few days later. Mills denied calling or texting E.S. the night of September 12 or morning of September 13. Mills also rejected the idea he was dating E.S., saying she was just a client who "kind of hung around" the tattoo shop.

Detective Larson followed up by sending subpoenas to several phone companies and email providers. Because E.S. had Verizon phone service, Larson contacted Verizon with her number and asked to have the company identify the blocked number from which she received the flurry of calls. State's Exhibit 1 was a spreadsheet provided by Verizon in response to the subpoena. The spreadsheet showed the unblocked number as the same phone number where the detective

had reached Mills.  Detective Larson also sent a subpoena to Yahoo, an email service, to verify Mill's account.  State's Exhibit 2 was Yahoo's response, including a "business record declaration" and verification of the DerekCMills@Yahoo.com email address.

Detective Larson also preserved "screen shots" from E.S.'s cell phone listing Derek's contact information (E.S. knew him by the last name of Wright, not Mills), offered as State's Exhibit 4.  In addition, Larson sent a subpoena to a company called Text Me, seeking information about the number in E.S.'s contact list.  Exhibit 5 was the return correspondence from Text Me, showing subscriber information linking the phone number in Exhibit 4 with DerekCMills@Gmail.com account, provided through Google.  Larson then sent Google a subpoena for user records.  State's Exhibit 6 was the return, which listed a recovery email of DerekCMills@Yahoo.com.

After Detective Larson received responses from his subpoenas, he set up an in-person interview with Mills in March 2017.  During that conversation, Mills admitted he and E.S. had "gone out a few times."  Eventually, Mills told the officer they had discussed moving in together.  The detective doubted Mills's truthfulness, given his evolving description of his relationship with E.S.

After E.S. reported the slashed tires to police, she started receiving text messages from an unfamiliar number.  She saved those messages to show Detective Larson.  State's Exhibit 14 contained screen shots of several messages, which appeared to be from someone—other than Mills—proclaiming responsibility for slashing the tires.  For example, the first message said: "You aren't to [sic] smart are you? Hear your [sic] accusing some tattoo guy for what I did to your bitch

ass… Haha ruin his life is so funny. good one dear." A later message made reference to working at "Pints"—a bar where E.S. knew Mills used to work. Detective Larson learned that a company called Text Now owned the number associated with those text messages. The detective sent a subpoena to Text Now, but was unable to get a response because the company was based in Canada.

The State charged Mills with criminal mischief in the fourth degree, a serious misdemeanor. *See* Iowa Code §§ 716.1 (2017) (defining criminal mischief as "[a]ny damage, defacing, alteration, or destruction of property . . . when done intentionally by one who has no right to so act"), 716.6(a)(1) (classifying crime as fourth degree if "cost of replacing, repairing or restoring" the damaged property exceeds two hundred but does not exceed five hundred dollars).

At trial, the State called three witnesses: E.S. and two Carlisle police officers who investigated the damaged tires and the source of telephone calls and text messages E.S. received around the time her tire was slashed. Officer Brady Jackson testified he photographed one damaged tire on E.S.'s Nissan and one damaged tire on her housemate Matt's Chevy Silverado pickup truck. E.S. testified it cost $166.02 to fix the tire on her Nissan and $217.46 to fix the tire on the Silverado. During her testimony, the prosecutor offered photographs of receipts from two different repair shops, State's Exhibits 12 and 13, to document those amounts.

The jury returned a guilty verdict on fourth-degree criminal mischief. Mills appeals, attacking the admissibility of numerous exhibits.

## II.    Scope and Standards of Review

We generally review decisions admitting evidence for an abuse of discretion. *State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009). But we review hearsay rulings for legal error. *Id.* This standard of review extends to determining whether statements come within an exception to the general prohibition on hearsay evidence. *Id.* If we find evidence improperly admitted in this nonconstitutional context, we employ a harmless-error analysis. *See State v. Sullivan*, 679 N.W.2d 19, 29 (Iowa 2004). We presume prejudice and reverse unless the record affirmatively establishes Mills suffered no prejudice. *See State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006).

Where the offer of evidence draws no objection at trial, we may review on appeal if the issue is raised as ineffective assistance of counsel. *See State v. Wilkins*, 693 N.W.2d 348, 351 (Iowa 2005) ("Because no objection to this practice was made at trial, the claim is premised on an assertion that defendant received ineffective assistance based on trial counsel's failure to make such objection."). Because ineffective-assistance claims are grounded in the Sixth Amendment and article I, section 9 of the Iowa Constitution, we review them de novo. *See State v. Virgil*, 895 N.W.2d 873, 879 (Iowa 2017).

## III.    Analysis

Mills argues he is entitled to a new trial because the district court wrongly overruled his attorney's hearsay and authentication objections to five exhibits connecting Mills to the slashed tires and the cost of their repair.[1]

---

[1] At the end of the trial, defense counsel clarified that his objections related to Iowa Rule of Evidence 5.902(11), which provides that certain business records may be self-

At issue is the following evidence:

- Exhibit 1—Three-page response from Verizon, E.S.'s cell phone provider, to a subpoena for call records regarding the blocked number from which E.S. received nineteen calls on September 12, 2016.

- Exhibit 2—Six-page response from Yahoo to a subpoena for data from Mills's email account, including a "business records declaration" by a company records custodian.

- Exhibit 5—Nine-page response from Text Me to a subpoena for records associated with what E.S. believed to be Mills's phone number.

- Exhibit 6—Two-page response from Google to a subpoena for verification of Mills's Gmail account, including a "certificate of authenticity" by a company records custodian.

- Exhibit 13—Cell phone photograph of repair bill from Firestone showing cost of replacing Matt's tire.

**Authentication.** We first address the question of authentication. "Authentication or identification represents one component in the relevancy determination with regard to certain types of evidence, such as the contents of a document . . . . Authentication or identification establishes a connection between the exhibit and the subject matter of the litigation." Laurie Kratky Doré, 7 *Iowa Practice Series: Evidence* § 5.901:0.[2] In general, to satisfy the authentication rule,

---

authenticating if certain requirements are met, including advance notice by the proponent of the intent to offer the exhibit.

[2] Federal courts have reasoned that rule 901 "does not erect a particularly high hurdle," and the hurdle "may be cleared by 'circumstantial evidence.'" *United States v. Tin Yat Chin*, 371 F.3d 31, 37 (2d Cir. 2004); *see also United States v. Gadson*, 763 F.3d 1189, 1203 (9th Cir. 2014) (explaining that party offering evidence must make a prima facie

"the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Iowa R. Evid. 5.901(a). One means to satisfy the requirement is "[t]estimony of a witness with knowledge" that "an item is what it is claimed to be." *Id.* r. 5.901(b)(1). The witness must have personal knowledge of the matter. *Id.* r. 5.602.

For Exhibits 1, 2, 5, and 6, Detective Larson testified he received the company documents in response to his subpoenas. The detective could speak to the receipt of the documents he had subpoenaed. *See Minemyer v. B-Roc Representatives, Inc.*, 678 F. Supp. 2d 691, 709 (N.D. Ill. 2009) (finding "[p]roduction by Verizon pursuant to the subpoena [was] sufficient to authenticate the documents as having been found in Verizon's files"). We find no abuse of discretion in the district court's rejection of the defense objection to these exhibits on authentication grounds. *See Baker v. Commonwealth*, 545 S.W.3d 267, 275 (Ky. 2018) (finding rule 901(a)—analogous to Iowa Rule of Evidence 5.901— satisfied where detective "testified he received the call logs in response to a subpoena he sent to [the victim's] cell phone carrier").

As for State's Exhibit 13, the invoice from Firestone, E.S. testified, "This is a bill for us getting new tires, because they were ruined." She identified the amount of $217.46 on the photographed bill from Firestone as the cost to replace a tire on Matt's Silverado truck.[3] Mills points out on appeal that the prosecutor did not ask

---

showing "so that a reasonable juror could find in favor of authenticity or identification"); *Transclean Corp. v. Bridgewood Servs., Inc.*, 101 F. Supp. 2d 788, 799 (D. Minn. 2000) (describing burden of proof under Rule 901 as "slight").

[3] At the same time, the prosecutor offered, through E.S.'s testimony, State's Exhibit 12, a bill in the amount of $166.02 from Shaffer's Auto Body and Repair for replacing the tire slashed on her Nissan. Defense counsel did not object to the admission of Exhibit 12, an omission Mills challenges on appeal as ineffective assistance of counsel.

E.S. any questions about how the Firestone invoice was generated, who received the invoice, or how she knew the document was what it was purported to be. The Firestone invoice, unlike the other repair invoice, is not addressed to E.S.; nor does the record show who paid it.

Courts from other jurisdictions have allowed the recipient of a repair bill to testify the document was, in fact, what he or she claimed it to be. *See Harris v. Jamaica Auto Repair Inc.*, No. 03-CV-417 (ERK), 2009 WL 2242355, at *3 (E.D.N.Y. July 27, 2009) (stating if plaintiff testified she received the repair bills in question that would be "sufficient for a jury to determine that the invoices for repairs are what plaintiff claims them to be"); *Moskowitz v. Main Towing*, No. SC-0732-14, 2015 WL 1880167, at *3 (N.J. Super. App. Div. Apr. 27, 2015) (allowing plaintiff's testimony to establish bill for the repairs that he paid). But those cases do not address the situation we have here, where the record does *not* show the witness who is attempting to authenticate the repair bill was the same person who received or paid it. The State did not show the requisite connection between Exhibit 13 and the subject matter of the litigation—here the amount of property damage allegedly caused by Mills's actions. E.S. did not testify to her personal knowledge of the bill for replacing her housemate's tire. *See* Iowa R. Evid. 5.602; *Coad v. Pa. Ry. Co.*, 175 N.W. 344, 347 (Iowa 1919) (finding exclusion of testimony was proper because "naked fact" that one possesses "a record" concerning details of a business transaction "does not qualify him to speak as to such matters where he has no personal knowledge concerning the same"). Because Exhibits 12 and 13 came from different auto shops, the jury could not infer that E.S. had personal

knowledge concerning both repair bills. We conclude the State failed to meet the threshold for authentication of Exhibit 13.

**Hearsay.** But even if the State satisfied rule 5.901 for Exhibit 13, as well as Exhibits 1, 2, 5, and 6, we still need to examine their admissibility under the hearsay rules. In its appellee's brief, the State acknowledges Mills "is correct to identify a hearsay problem with some of these exhibits."

We start with Exhibit 13, the photograph of the repair bill from Firestone. The State concedes the exhibit "qualifies as hearsay generated by a human person and offered to prove the truth of the matter asserted (price of repair)." *See* Iowa R. Evid. 5.801(c). But the State contends the admission of Exhibit 13 was harmless because E.S.'s testimony regarding the cost of replacing each tire was sufficient evidence of valuation. As discussed in the authentication section, the record does not show E.S. had personal knowledge of the amount Matt paid to replace his tire—apart from what was shown on the invoice. Accordingly, allowing the jury to consider the Firestone invoice was not harmless error.

We turn next to Exhibits 2 and 6, the subpoena responses from Yahoo and Google. Both responses were accompanied by a declaration or certification from a records custodian. The Yahoo custodian noted the company's servers recorded the requested data automatically. The Google custodian likewise explained its servers "recorded this data automatically" at the time it was entered or transmitted by the user. Because these were computer-generated records, with no human declarant, they did not constitute hearsay. *See State v. Reynolds*, 746 N.W.2d 837, 843 (Iowa 2008) (acknowledging if the Federal Reserve's process to produce

records was fully automated and reliable involving no human declarant, it was arguably not hearsay).

Exhibits 1 and 5, the subpoena responses from Verizon and Text Me, call for different treatment. These exhibits included no certifications from records custodians. Accordingly, the State agrees on appeal that additional foundation was needed to establish the content of these exhibits did not constitute hearsay.[4] *See id.* (concluding district court erred in admitting bank statements where "no evidence in the record from any person with knowledge as to how the Federal Reserve error reports were created or as to the reliability of the error reporting system in general"). The State pins its hopes for affirmance on harmless error.

The State first contends "sustaining an objection based on a lack of foundation to establish the non-hearsay character of this evidence would have just prompted the State to correct that deficiency and re-offer the reports."[5] Giving the State a second chance to properly present its exhibits is not the same as showing admission was harmless. We cannot take it on faith that the State could have made a complete record for admissibility but chose to offer Exhibits 1 and 5 without doing so. In fact, the presumption of prejudice flows against the proponent of evidence that is inadmissible without further foundation. *See id.* ("Under Iowa Rule

---

[4] The State contends with proper certification, it could establish these were "computer-generated non-hearsay records." The State does not argue that if a human declarant was involved, the records would be admissible under the business records exception. *See* Iowa R. Evid. 5.803(6), 5.902(11).

[5] In support of its position, the State cites *Griggs v. State*, No. 12-0057, 2013 WL 1223641, at *3 (Iowa Ct. App. Mar. 27, 2013). But *Griggs* addressed a claim of ineffective assistance of counsel for failure to object to lack of foundation for phone records, not a preserved error where the burden is on the proponent of the evidence to affirmatively show admission was not prejudicial. *See Reynolds*, 746 N.W.2d at 843.

of Evidence 5.103(a), we presume prejudice arises from nonconstitutional error and reverse unless the record affirmatively establishes otherwise.").

The State next downplays the importance of Exhibits 1 and 5, asserting "these records were only used to help show that Mills was the person who placed blocked calls and sent text messages to [E.S.]—but evidence from other sources established that Mills sent more relevant text messages connecting him to this tire-slashing." The State argues the profane text message E.S. received from the phone number she associated with Mills from prior exchanges could, standing alone, show he came to her house the night of September 12. The State further argues the identity of the blocked caller established through the Verizon documents was cumulative to that key, incriminating text message.

We are not convinced the information contained in Exhibits 1 and 5 was merely cumulative to other evidence properly in the record so as to allow a finding that their wrongful admission was harmless. The detective testified to the interrelated nature of the subpoena responses. After the detective identified State's Exhibit 5 as the return from the Text Me company for a particular phone number that E.S. had for Derek "Wright," the detective agreed the subpoenaed information "tied this all together." In addition, the State emphasized the nineteen phone calls in its opening statement, in its examination of witnesses, and again in its closing argument. The prosecutor argued Mills was angry E.S. had a male housemate and called her repeatedly the night the tires were slashed: "Answer your phone. Answer your phone. Answer your phone. Answer your phone. Answer your phone. And the more that she doesn't answer her phone, the madder he gets."

As a final harmless-error argument, the State contends the other evidence against Mills was overwhelming.  For instance, the State asserts, "[H]is story about his interactions with [E.S.] changed dramatically, which raised a strong inference that he lied to conceal his connection to that act of vandalism."  We disagree the evidence of guilt was overwhelming.  Mills's shifting story concerning his level of romantic involvement with E.S. may have raised suspicions with the detective, but it did not provide sufficient evidence that Mills was the person who slashed the tires.  Because the State's case against Mills depended on the content of Exhibits 1 and 5, and the State did not establish those exhibits were admissible over a hearsay objection, we reverse and remand for a new trial.  A new trial is also warranted based on the erroneous admission of Exhibit 13, which establishes more than half the value of the destroyed property for fourth-degree criminal mischief.

Because we find grounds for reversal based on preserved error, we need not reach Mills's claims concerning the effectiveness of trial counsel.

**REVERSED AND REMANDED.**