Harmon Lee MANUEL, II, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–09–00454–CR.

Court of Appeals of Texas, Tyler.

Aug. 31, 2011.

Discretionary Review Refused Dec. 14, 2011.

Uttam Dhillon, for Appellant.

Michael J. West, Aaron Rediker, for State of Texas.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## OPINION

SAM GRIFFITH, Justice.

Appellant Harmon Lee Manuel, II was charged with stalking C.L.L.,[1] the sister of a friend, over the course of approximately three years, as she attended colleges in three states. The indictment contained four specific allegations of stalking, alleging that Appellant threatened to put C.L.L.'s personal information on the internet, made repeated and threatening phone calls to C.L.L., threatened C.L.L. via electronic communication, and threatened to kill C.L.L.

After a bench trial, the court found Appellant guilty as charged, and sentenced him to six years of imprisonment. Appellant raises seven issues on appeal. We affirm.

### Background

The record shows that Appellant met C.L.L., the sister of a friend, in 2003 when C.L.L. was a junior in high school. Beginning in late 2003, Appellant began calling her family's residence "every day" and leaving messages on the answering machine for C.L.L. In each of these messages, Appellant identified himself and asked that C.L.L. call him. This continued until C.L.L. graduated from high school the following year. C.L.L. did not return the calls.

C.L.L. began her freshman year of college in Oklahoma in 2004 and acquired a cell phone. Appellant then began calling her cell phone two or three times a week and leaving messages for her to call him. In some of the messages, he also suggest-

---

1. We have chosen to identify the victim by her initials.

ed that perhaps she could meet him somewhere or that they go to another city together. C.L.L. had not given Appellant her cell phone number and did not return the calls.

For the second semester of her freshman year, C.L.L. attended college in Texas. Appellant continued to call her. That summer, C.L.L. returned to her parents' home in Smith County. Appellant's calls continued, but his messages began to include statements that he was "mad" because he was not invited to her brother's wedding. Exasperated by the constant phone calls, and the increasingly angry tone of the messages, C.L.L. "picked up" one of his phone calls and demanded that he never call her again.

The next school year, C.L.L. went to college in Colorado. She created a MySpace page and received a message identifying "Harmon" as the sender. "Eventually," C.L.L. sent a message to Appellant's MySpace account directing him to leave her alone. But instead of stopping, the number of MySpace messages "escalated" to "about 20 to 30" each day. Some of these messages identified other individuals as the sender, but C.L.L. concluded that Appellant sent all of the messages because their content was the same. The calls to her cell phone continued as well. Each time she received a call from a phone number she recognized as Appellant's, there would also be a voice mail from Appellant. The nature of these voice mails varied: "angry, trying to be sweet, just sometimes weird random things that [Appellant] would leave, weird recordings that he would leave. But mainly yelling and— definitely escalated to that point. But mostly yelling."

In some of the messages, Appellant threatened to take away C.L.L.'s voice mailbox and not give it back to her until he saw her. The voice mailbox held only twenty messages. As C.L.L. deleted Appellant's messages, he would continually refill the mailbox with new messages. In one day alone, C.L.L. had 241 calls from Appellant in only a few hours. Some days she received over four hundred calls from him, but she received an average of two hundred calls a day during that school year. In other voice-mail messages, Appellant would tell her he had a trip planned for them to another city or that he had a plane ticket he had bought, would be at the airport at a certain time, and that she needed to pick him up. She changed her cell phone number several times, but Appellant was able to quickly get her new number from the telephone companies and continue the calls.

C.L.L. also began to receive text messages from Appellant. Some of the messages displayed Appellant's phone number, and often the messages identified the sender as "Harmon." Some of the texts were directed to C.L.L., but with the name "Manuel" added after her first and middle name, as if this were her "married name." She also received messages that she needed to get used to "Manuel" being her name. In some of the messages, Appellant told her he loved her.

When she again returned to her parents' home for the summer, the calls, voice-mail messages, and text messages continued. Ultimately, C.L.L. received a text messages that included the threat "I will kill you, so you will understand." Another text message threatened "You're going to get yourself killed." Another said "I swear to God, I'm going to kill you." Yet another said "I'm going to kill you, I'm going to make sure you die." After she posted a picture of herself and her boyfriend in Colorado on her MySpace page, Appellant threatened "You're going to get yourself killed because of those stupid pictures on MySpace."

In the fall of 2006, C.L.L. began attending college in Tyler. One of C.L.L.'s friends testified that Appellant approached her after a UT–Tyler volleyball game, gave her a ring in a box, and asked her to give it to C.L.L. This occurred during the time Appellant was texting C.L.L., but substituting his own last name for hers, as if they were married. He had also told her in one of the messages that he was going to put something on her finger

Another witness, a woman from Appellant's hometown of Waskom, Texas, testified that Appellant had previously stalked her. The woman testified that Appellant had the same pattern of behavior, obsessively texting and calling her, leaving hundreds of messages, often revealing his name, and allowing his telephone number to be displayed. Some days he would leave the woman fifty to one hundred messages. The pattern of calls, text messages, and e-mails continued, even after she went to Tyler Junior College, and then later continued her education in College Station. When she returned to Tyler in 2004, the number of messages increased to fifty to one hundred a day, in addition to twenty to thirty telephone calls. During December 2004, Appellant began lurking around her apartment. She would see him and his car outside the apartment, and he would text her to come outside to talk to him. She called the police and the apartment manager in an effort to get him off the property and away from her. One day, Appellant began knocking on the door to get her to come outside and talk with him. Her roommate's boyfriend opened the door and was going to go outside and encourage Appellant to leave. But when he opened the door, Appellant rushed into the apartment, and ran to the woman "yelling ... to give him a hug." The roommate's boyfriend pushed him out the door, and they called the police. The woman testified that she was scared of what Appellant might do to her.

After hearing the evidence, the trial court found Appellant guilty, and sentenced him to six years of imprisonment. This appeal followed.

### DENIAL OF FAIR TRIAL UNDER SIXTH AND FOURTEENTH AMENDMENTS

In his first issue, Appellant argues that he was denied a fair trial as guaranteed by the Sixth Amendment of the United States Constitution, and made applicable to the states under the Fourteenth Amendment. More precisely, Appellant contends that, due to various specified actions of his trial counsel, he was deprived of his constitutional right to counsel that would act as an advocate for him. Without that confrontational advocacy, his argument continues, the trial court was biased. Using *United States v. Cronic* as the fulcrum for his argument, Appellant quotes the Supreme Court for his thesis: "[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of advocate.' ... But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." *United States v. Cronic*, 466 U.S. 648, 656–57, 104 S.Ct. 2039, 2045–46, 80 L.Ed.2d 657 (1984). However, in this case, *Cronic* is inapt.

### Standard of Review and Applicable Law

The United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. That assistance of counsel must be "effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970). However, under *Cronic*, the focus is on "the constructive denial of counsel." *Cannon v. State*, 252 S.W.3d 342, 349 (Tex.Crim.App.2008).

Because of the presumption that counsel's assistance is essential, a trial is unfair if the accused is denied counsel at a critical stage of his trial. *Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047. "Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.,* 466 U.S. at 659, 104 S.Ct. at 2046; *see also Bell v. Cone,* 535 U.S. 685, 696–97, 122 S.Ct. 1843, 1851–52, 152 L.Ed.2d 914 (2002) (requiring "complete" failure to contest the prosecution's case before prejudice is presumed). When an appellant establishes counsel's "entire" failure to act as an advocate, no showing of prejudice is required. *Id.,* 466 U.S. at 659, 104 S.Ct. at 2047. If he does not establish an "entire" failure to act as an advocate, we analyze the claims of counsel's deficiency under the standard announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### Analysis

■ Here, Appellant identifies certain actions of his trial counsel that he contends constituted the complete failure of counsel addressed in *Cronic:* (1) consenting to Appellant's waiver of his right to a jury trial, (2) advising the trial court that they expected the State's evidence would likely be admitted, "effectively conceding to the trial court that Appellant's future objections were without merit," (3) advising the trial court that "they believed Appellant had no legal defense," and would probably be convicted, and (4) advising the court that Appellant had turned down an offer of probation against the advice of counsel. However, in this issue, as was the case in *Bell,* Appellant challenges his counsel's performance at specific points in the trial, rather than asserting that his counsel failed to oppose the prosecution throughout the trial as a whole. *See Bell,*

535 U.S. at 697, 122 S.Ct. at 1851. The aspects of counsel's performance that Appellant challenges here "are plainly of the same ilk as other specific attorney errors [the Supreme Court] has held subject to *Strickland*'s performance and prejudice components." *See id.,* 535 U.S. at 697–98, 122 S.Ct. at 1851–52. Therefore, Appellant's has failed to establish that his trial counsel's actions constituted a constructive denial of counsel. Appellant's first issue is overruled.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In Appellant's second issue, he argues that he was denied effective assistance of counsel, based on *Strickland v. Washington* and its progeny.

### Applicable Law

Claims of ineffective assistance of counsel are evaluated under the two step analysis articulated in *Strickland v. Washington.* The first step requires the appellant to demonstrate that trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065. To satisfy this requirement, the appellant must identify the acts or omissions of counsel alleged to be ineffective assistance and affirmatively prove that they fell below the professional norm of reasonableness. *See McFarland v. State,* 928 S.W.2d 482, 500 (Tex.Crim.App. 1996). We will not find ineffectiveness by isolating any portion of trial counsel's representation, but will judge the claim based on the totality of the representation. *See Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069.

In any case considering the issue of ineffective assistance of counsel, we begin with the strong presumption that counsel was effective. *See Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App.1994). We

must presume counsel's actions and decisions were reasonably professional and were motivated by sound trial strategy. *See id.* Appellant has the burden of rebutting this presumption by presenting evidence illustrating why his trial counsel did what he did. *See id.* Appellant cannot meet this burden if the record does not affirmatively support the claim. *See Jackson v. State,* 973 S.W.2d 954, 955 (Tex. Crim.App.1998) (inadequate record on direct appeal to evaluate whether trial counsel provided ineffective assistance). A record that specifically focuses on the conduct of trial counsel is necessary for a proper evaluation of an ineffectiveness claim. *See Kemp v. State,* 892 S.W.2d 112, 115 (Tex. App.-Houston [1st Dist.] 1994, pet. ref'd).

*Analysis*

■ Appellant argues that he received ineffective assistance of counsel because his counsel (1) consented to Appellant's waiver of his right to a jury trial, (2) advised the trial court that they expected the State's evidence would likely be admitted, "effectively conceding to the trial court that Appellant's future objections were without merit," (3) advised the trial court that "they believed Appellant had no legal defense," and would probably be convicted, and (4) advised the court that Appellant had turned down an offer of probation against the advice of counsel. However, Appellant did not file a motion for new trial, and the record does not contain any posttrial hearing in which Appellant raised ineffective assistance. Nor can we conclude that this is one of those rare cases in which the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *See Goodspeed v. State,* 187 S.W.3d 390, 392 (Tex.Crim.App.2005). Moreover, Appellant focuses on the pretrial hearing, but makes no complaint about trial counsel's performance at trial. Indeed, the record shows that trial counsel (1) was familiar with the facts and the law, (2) strenuously, repeatedly, and sometimes successfully lodged objections to the State's evidence of the electronic communications C.L.L. received, (3) extensively and repeatedly examined the State's witnesses both during cross examination and on voir dire, (4) vigorously argued that the State had not established Appellant's identity as C.L.L.'s stalker and therefore he should be acquitted, (5) urged the unconstitutionality of the statute under which Appellant was prosecuted, and (6) presented mitigation witness testimony prior to sentencing and a favorable evaluation of Appellant's potential for further criminal behavior.

Based on the record before us, and in the absence of any opportunity for trial counsel to explain the challenged conduct, we cannot say that Appellant met his burden of showing by a preponderance of the evidence that his trial counsel's representation fell below the standard of prevailing professional norms. *See Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2065. Accordingly, he has not satisfied the first requirement of *Strickland.* Appellant's second issue is overruled.

### ADMISSIBILITY OF EVIDENCE

In his third issue, Appellant complains that the trial court erred in admitting evidence that was not relevant. Specifically, he contends the trial court erred in admitting photographs and printouts of electronic communications, which he contends were of "questionable reliability," and which, he maintains, contain "no credible identifying information." Appellant characterizes the State's exhibits admitted by the trial court as "an evidentiary house of cards built entirely upon a lay witness's identification of Appellant's purported telephone number." He urges that once the text messages showing a telephone number were admitted into evidence, the State

impermissibly used those exhibits to bootstrap all of the other electronic messages into evidence.

The State counters that the exhibits complained of include distinctive characteristics that were relevant to proving the consequential fact of Appellant's identity as the author of the messages, and ultimately Appellant's identity as C.L.L.'s stalker.

### Standard of Review and Applicable Law

A trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex.Crim.App. 2003). If the ruling is within the zone of reasonable disagreement, an appellate court will not disturb it. *Id.* When a trial court further decides not to exclude the evidence, finding that the probative value of the evidence is not outweighed by the danger of unfair prejudice, this decision will also be given deference. *Id.* Thus, the court of appeals cannot simply substitute its own decision for that of the trial court. *Id.*

Only relevant evidence is admissible. TEX.R. EVID. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Therefore, to be relevant, evidence must be material and probative. *Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim.App.2001). Evidence is material if is "shown to be addressed to the proof of a material proposition, i.e., any fact that is of consequence to the determination of the action." *Id.* at 507. Evidence is probative if it tends to make the existence of the fact more or less probable than it would be without the evidence. *Id.* Thus, the proffered evidence is relevant if it has been shown to be material to a fact in issue and if it makes that fact more probable than it would be without the evidence. *Id.* Evidence merely tending to affect the probability of the truth or falsity of a fact in issue is logically relevant. *Simpson v. State*, 181 S.W.3d 743, 749 (Tex.App.-Tyler 2005, pet. ref'd). The evidence need not by itself prove or disprove a particular fact. *Id.* It is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence. *Id.*

The issue of authentication arises when, as in this case, "the relevancy of any evidence depends upon its identity, source, or connection with a particular person place, thing, or event." *Shea v. State*, 167 S.W.3d 98, 104 (Tex.App.-Waco 2005, pet. ref'd). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX.R. EVID. 901(a). Rule 901 "does not erect a particularly high hurdle, and that hurdle may be cleared by circumstantial evidence." Peter T. Hoffman, TEXAS RULES OF EVIDENCE HANDBOOK, Article IX at p. 948 (8th ed. 2008–09) (quoting *United States v. Chin*, 371 F.3d 31, 37 (2d Cir.2004)). The proponent of the evidence does not need "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *Id.* (quoting *Chin*, 371 F.3d at 37). The proponent must only produce sufficient evidence that a reasonable fact finder could properly find genuineness. *Sanford v. State*, No. 12–08–00012–CR, 2009 WL 3161505, at *2 (Tex.App.-Tyler Sept. 30, 2009, pet. ref'd) (mem. op., not designated for publication).

Authentication can be accomplished in various ways. For example, evidence may be authenticated by testimony from a

witness with knowledge that a matter is what it is claimed to be. TEX.R. EVID. 901(b)(1). Evidence may also be authenticated by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." TEX.R. EVID. 901(b)(4). Generally, these two rules are the most common authentication techniques used for e-mail, websites, text messages, and other electronic evidence. *See* Steven Goode, *The Admissibility of Electronic Evidence*, 29 REV. LITIG. 1, 10 (Fall 2009) (discussing authentication of e-mails, websites, instant and text messages, chat room postings, digital photography, and computer animations or simulations).

■■■ An e-mail is properly authenticated if its appearance, contents, substance, or other distinctive characteristics, taken in conjunction with circumstances, support a finding that the document is what its proponent claims. *See Shea*, 167 S.W.3d at 105; *Massimo v. State*, 144 S.W.3d 210, 215–16 (Tex.App.-Fort Worth 2004, no pet.). Characteristics to consider in determining whether e-mail evidence has been properly authenticated include (1) consistency with the e-mail address in another e-mail sent by the alleged author; (2) the author's awareness, shown through the e-mail, of the details of the alleged author's conduct; (3) the e-mail's inclusion of similar requests that the alleged author had made by phone during the time period; and (4) the e-mail's reference to the author by the alleged author's nickname. *Massimo*, 144 S.W.3d at 215–16 (citing *United States v. Siddiqui*, 235 F.3d 1318, 1322–23 (11th Cir.2000), *cert. denied*, 533 U.S. 940, 121 S.Ct. 2573, 150 L.Ed.2d 737 (2001)).

Text messages can be authenticated by applying the same factors. *See, e.g., Dickens v. State*, 175 Md.App. 231, 927 A.2d 32, 35–38 (2007) (threatening text messages received by victim on cell phone contained details few people would know and were sent from phone in defendant's possession at the time); *In re F.P.*, 878 A.2d 91, 95 (Pa.Super.2005) (threatening instant messages properly authenticated through circumstantial evidence including screen names, context of messages, and surrounding circumstances); *see also* Goode, *supra*, at 9. Rule 901(b)(4) has also been applied to authenticate MySpace evidence. *See Tienda v. State*, No. 05-09-00553-CR, 2010 WL 5129722, at *4–5 (Tex.App.-Dallas Dec. 17, 2010, pet. granted). And other jurisdictions have applied similar rules to Facebook messages. *See, e.g., State v. Eleck*, 130 Conn.App. 632, 641–42, 23 A.3d 818 (2011) (showing that messages came from particular Facebook account insufficient to authenticate messages without further "foundational proof"); *Commonwealth v. Purdy*, 459 Mass. 442, 450–51, 945 N.E.2d 372 (2011) (holding that e-mail sent from Facebook account bearing defendant's name not sufficiently authenticated without additional "confirming circumstances").

■■■ Another traditional method of authentication permitted by Rule 901 is the "reply-letter doctrine." *Varkonyi v. State*, 276 S.W.3d 27, 35 (Tex.App.-El Paso 2008, pet. ref'd) (citing Cathy Cochran, TEXAS RULES OF EVIDENCE HANDBOOK, Article IX, at 915 (6th ed. 2005)). Under this doctrine, a letter received in the due course of mail purportedly in answer to another letter is prima facie genuine and admissible without further proof of authenticity. *Id.* This doctrine applies to e-mails. *Id.* Therefore, an e-mail is sufficiently authenticated when a person responds to an e-mail that was sent to the person's e-mail address. *Id.* This rule has been applied to other types of messages by analogy. *See, e.g., People v. Pierre*, 41 A.D.3d 289, 838 N.Y.S.2d 546,

548–49 (N.Y.App.Div.2007) (applied to instant message where person sent instant message to screen name and received reply, content on reply supported conclusion that message was sent by defendant, and no evidence was admitted to show anyone else had motive or opportunity to impersonate defendant by using his screen name).

Rule 901 clearly provides that the illustrations are not exclusive means of authentication. *See* Tex.R. Evid. 901(b) ("By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule[.]")

### Analysis

■ At trial, the State introduced seventy-four exhibits that were either photographs or printouts of electronic communications alleged to have been sent by Appellant to C.L.L., her friends, or her family. Appellant contends that seventy-one of these exhibits were inadmissible. As a threshold issue, he asserts that the evidence used to establish Appellant's telephone number was inadequate but was, nevertheless, the foundation for the admissibility of the challenged exhibits.

### 1. *Proof of Appellant's Telephone Number (State's exhibits 1 through 28).*

State's exhibits 1 through 28 are photographs of text messages received by C.L.L. on her cell phone. Each of these text messages displays the telephone number that C.L.L. identified as Appellant's. However, Appellant complains that C.L.L.'s testimony is the only evidence adduced at trial linking the telephone number in the text messages to Appellant. He urges that the trial court erred in admitting these exhibits because the State presented no evidence that the phone from which the messages were received was in Appellant's exclusive control or even that Appellant owned a cell phone. We note,

however, that Appellant cites no authority requiring any such evidence to establish that a phone number is assigned to a particular individual.

C.L.L. testified that after she met Appellant in 2003, during her junior year in high school, he began calling her every day on her home telephone and leaving a voice message on her parents' answering machine. Appellant identified himself in each message and asked her to call him. It is through these voice messages that C.L.L. became familiar with Appellant's voice and the telephone number that appears in the photographs of the text messages.

In 2004, C.L.L. began her freshman year of college in Oklahoma and purchased a cell phone, but did not give Appellant the number. During the first semester, however, Appellant called her approximately two or three times every week on her cell phone and left voice-mail messages. She recognized the number appearing on her cell phone as Appellant's. When she listened to the voice-mails left from that number, she recognized Appellant's voice. Appellant also identified himself in the voice-mails and asked her to call him. For the second semester of her freshman year, she returned to Texas. Appellant continued to call her and leave voice-mail messages. She moved home for the summer following her freshman year at college, but Appellant's calls and messages did not stop.

For her sophomore year, C.L.L. went to college in Colorado, and Appellant continued to call her. That year, he would fill her voice mailbox with messages, keeping it full so that no other person could leave her a message. C.L.L. estimated that, on average, she received two hundred calls a day from Appellant. She also stated that for a "significant number" of these calls, the voice-mails she received were shown to

have originated from Appellant's telephone number. In addition, she received approximately two hundred text messages each day. A number of these messages showed they originated from Appellant's telephone number. Some did not display the telephone number from which they originated. In some of the text messages, the sender was identified as "Harmon." Additionally, some of the messages referred to her as "[C.L.] Manuel." C.L.L. testified that she did not know anyone else named "Harmon" or "Manuel."

After she returned home for the summer in 2006, she continued to receive calls and voice-mails from Appellant. In each of these voice-mails, she recognized the voice to be Appellant's. She also continued receiving text messages. Some of these messages included Appellant's telephone number, and some identified the sender as "Harmon."

### 2. *Exhibits 29 through 40.*

Appellant points out that the text messages depicted in State's exhibits 29 through 40, which were received by C.L.L. on her cell phone, do not include a telephone number or "any other credible identifying information." Instead, they show only that they were sent from someone identified as "me." Appellant further points out that their content is angry or threatening, which is exactly the opposite of the tone of State's exhibits 1 through 28. However, these messages include other characteristics that undercut Appellant's argument.

For example, in State's exhibit number 22, in which Appellant's phone number was displayed, he queried, "Why are you asking me if I have $25000?" C.L.L. received the same query in a message from "me" (State's exhibit 29).[2] These duplicate messages suggest that Appellant and "me" are

the same person. In exhibit 36, Appellant reminded C.L.L. about "our trip to Denver next week on July 21 or 22." In exhibit 37, Appellant threatened to show up at C.L.L.'s home and informed her that "[y]ou need to be in Austin by Friday." C.L.L. testified that, in his voice-mails, Appellant sometimes invited her to travel with him to other cities, such as "Dallas, Denver, Austin, Houston, you [know], just trips everywhere." She also testified that, at the time she received these text messages, there was no other person in her life who wanted to take her on trips. In exhibit 38, C.L.L. was informed that "[t]omorrow I will be sending you over 200 text messages so no one else can send you a text." She confirmed that the following day, Appellant sent her approximately two hundred text messages.

C.L.L. posted pictures of her boyfriend on her MySpace page. Afterward, in August 2006, she received the following text messages, all from the sender "me" but with no displayed telephone number:

> FRM: me
>
> MSG: a message was just left on your parents voice-mail. Your life is about to be ruined really soon the minute I put your social security number online. [exhibits 35 and 35A]
>
> FRM: me
>
> MSG: I passed by your house last week and the next time a lot more is going to happen. It will be happening very soon. [exhibits 34 and 34A]
>
> FRM: me
>
> MSG: your life is going to be taken away from you one day. This is all going to come back on you. [exhibit 40]
>
> FRM: me

---

2.  C.L.L. denied that she ever asked Appellant whether he had $25,000.

MSG: you are going to get yourself killed because of those stupid pictures on myspace. I swear to god I'm going to kill you. [exhibits 33 and 33A]

FRM: me

MSG: u are goin to push me over the edge one day and I'm going to kill u. that faggot is not your boyfriend and those pictures are goin to come back on u. [exhibit 32]

FRM: me

MSG: the longer you stay away from me the more and more I get angry and it's getting to the point that I will kill you so you will understand. [exhibit 31]

C.L.L. testified that in response to one of these threatening messages, she sent a text message to Appellant's telephone number asking why he had threatened to kill her if he loved her so much. In response, she received the following text messages, identifying the sender as "Harmon" and including Appellant's telephone number:

It was a mistake b/c some of them were telling me all kinds of stuff that went to my head. I thought I was losing u and I will never say anything like that again.

From: Harmon

[Appellant's phone number] [exhibit 24]

Did you know that I love you? I do a lot of crazy things but I have a fear of losing you. I still remember the first day I ever meet you.

From: Harmon

[Appellant's phone number] [exhibit 25]

That was the wrong thing to say, a lot of people on that crazy website were pissing me off and I was letting it go to my head. I'm sorry.

From: Harmon

[Appellant's phone number] [exhibit 26]

I will never mention anything like that again and when I get home tonite I will delete all those stupid profiles. Forgive me, for we all make mistakes.

From: Harmon

[Appellant's phone number] [exhibit 27]

[B]aby I'm so proud of you in so many ways, that's one of the main reasons why I care about you so much. In my heart I really do care even though my actions show otherwise.

From: Harmon [exhibit 28]

### Exhibits 44, 45, and 65 through 76

Appellant urges that exhibits 44, 45, and 63 through 76 also contain "absolutely no credible identifying information as to their source."

In exhibits 1 through 11 and exhibits 13 and 14, Appellant referred to C.L.L. as "[C.L.] Manuel." These messages displayed Appellant's telephone number. Exhibit 44 is from "yourboyfriend." But as in the messages that included Appellant's telephone number, C.L.L. is referred to in exhibit 44 as "[C.L.] Manuel." She is also informed that "you better get used to that name because it will be yours one day." This suggests that "yourboyfriend" and Appellant were the same person.

In exhibit 45, also from "yourboyfriend," C.L.L. is informed that "I got your mom's e-mail address and I'm going to send her a e-mail about us and tell her everything. I want her to see your profile manager." The following day, C.L.L.'s mother received a lengthy e-mail from media relations@onlinecityguides.com. C.L.L. testified that Appellant had told her he owned "this online city guides website." The sender of the e-mail described himself as "[C.L.L.'s boyfriend's personal assistance (publicist)]" and stated that "I was just wanting to leave you a e-mail to explain the situation between him and

[C.L.L.]. He asked me to do this because he wanted to clear up some things." In the e-mail, the sender referred to Appellant's "decision back in December 2005 to NOT allow [C.L.L.] to have her voice-mail box because he feels nobody else should be calling her or leaving her voice-mails since he hasn't seen her." This is a reference to Appellant's practice of keeping C.L.L.'s voice-mail box filled with messages so no one else could leave her a message. The sender also stated that "[C.L.L.] is his girlfriend and always will be and she will come around one day and realize that she belongs to him. He reminds her of that everyday, all day and she needs to spend more time with him now." In exhibit 20, sent about ten days later, Appellant confirmed that he had sent the e-mail to her mom ("I told your mom that you belong to me."). He also stated that "I told Jimmy [C.L.L.'s boyfriend in Colorado] that if he ever comes near you again he better have good insurance." This e-mail identifies the sender as "Harmon" and displays Appellant's telephone number.

Exhibits 65 through 76 are copies of text messages sent to C.L.L. from "yap." In exhibits 67 and 68, "yap" instructed C.L.L. "don't tell them who it came from just yet, put the caption "he loves me" and make it your default picture." In exhibits 71 and 72, "yap" told C.L.L. that "[y]ou missed a great night Friday, the concert was amazing. As I sit here on MySpace I start to rethink about putting something on your finger." In his next message, exhibit 73, "yap" informed C.L.L. that "[I] need you back in my life and I'm not going to let anyone take you away from me." In a later message (exhibits 65 and 66), "yap" states that he is going to put "something on your finger on this week, you will have to completely change after its on[.]"

One of C.L.L.'s friends testified that after one of their volleyball games, she was approached by someone who called her name and identified himself as "Harmon." She was asked if the person who approached her was in court, and she identified Appellant as that person. She said he told her he had a ring for C.L.L. and he wanted her to give the ring to C.L.L. The friend also testified that "he had been sending me messages on MySpace about it. So I kind of knew already, so I took the ring and went back to the dressing room and gave it to [C.L.L.]." The delivery of the ring is consistent with exhibits 65 through 68, which suggest that C.L.L. would be getting something (from "yap"), and 71 through 72, which state that the sender will be putting something on her finger (also from "yap"). The ring is also consistent with the text messages Appellant sent to C.L.L. in which he referred to her as "[C.L.] Manuel" (exhibits 1 through 11 displaying Appellant's telephone number, 13 through 14 displaying Appellant's telephone number, and 44 from "yourboy friend"), and his warning that "you better get used to that name because it will be yours one day" (exhibit 44).

Exhibit 73 warns that "I'm not going to let anyone take you away from me" and is consistent with the resentment of C.L.L.'s boyfriend in Colorado expressed in exhibits 20 ("I told Jimmy if he ever comes near you again he better have good insurance."), 32 ("that faggot is not your boyfriend and those pictures are going to come back on u"), and 33 ("you are going to get yourself killed because of those stupid pictures [of C.L.L. and her Colorado boyfriend] on myspace.").

### Exhibits 48 through 53

Exhibits 48 through 53 encompass a Facebook conversation between C.L.L.'s brother and Appellant, whose name appears on the printout identified as exhibits 48 through 53. The conversation occurred over several days beginning December 28,

2006. In his brief, Appellant states that "[n]o threats or meaningful admissions are made in these messages and they are remarkable only in their dearth of relevance to this case."

In the conversation, Appellant insisted that C.L.L. sit down and talk with him "today," and instructed her brother to "get back with me after you talk to her." C.L.L.'s brother responded that he "did not think that would happen anytime soon" and reminded Appellant about "when you told me that you'd leave [C.L.L.] alone a couple of summers ago or so . . . well, you lied to me . . . the best thing for everyone right now would be that you walk away from the situation, the same way I asked you to a while back, and never come back." Appellant did not dispute that C.L.L.'s brother had asked him to leave C.L.L. alone. Instead, he replied, "well if thats the case she needs to end that court mess before anything happens, if it hasn't already been ended." This appears to be a reference to the restraining order that C.L.L. sought, and ultimately was granted, against Appellant. The reply also includes the thinly veiled threat "before something happens," which is similar to exhibits 34 ("I passed by your house last week and the next time a lot more is going to happen. It will be happening very soon." (from "me")), 37 ("when I show up to your house its goin to be too late." (from "me")), and 39 ("This is all going to come back on you one day." (from "me")).

The next day, Appellant wrote that "nobody can prove that I threatened [C.L.L.], nobody can prove I said or wrote anything that threatened her so you can't say I did threatened her." In his subsequent comments, Appellant expressed his anger in profane terms as he mentioned C.L.L.'s reporting of his actions to the police and the restraining order that he characterized as "very STUPID and it didn't make any sense at all." He also relates something that he told the investigators. These comments indicate that the person identified as "Harmon Manuel" in this conversation is the subject of the restraining order.

### Exhibits 54 through 64

Exhibits 54 through 64 are MySpace messages sent to friends of C.L.L. Exhibits 54 through 56 were sent by "<<3 [C.'s] Profile Manager <<3" to James Bowron, C.L.L.'s boyfriend in Colorado. In exhibits 54 and 55, the sender threatened to kill C.L.L. "over those stupid pictures and you will see pictures of how she is going to die. She is not your girlfriend and she will never be and her life is going to be taken from her." These statements are similar to the threats in exhibits 32 and 33 from "me" in which C.L.L. was warned that "those pictures are going to come back on u" and that "you're going to get yourself killed because of those stupid pictures on MySpace." In exhibit 55, the sender mentioned his plan to ruin C.L.L.'s life by putting her personal information on the internet and also stated that "[C.L.L.] can't get any more voice-mails on her cell phone. . . . She is not getting it back for a while." The threat relating to her personal information is similar to exhibit 35 in which "me" threatens to put C.L.L.'s social security number online. The statement that C.L.L. "can't get any more voice-mails on her cell phone" is a reference to his keeping C.L.L.'s mailbox filled with messages so that no one else could leave a message. In exhibits 54 through 56, the sender uses the same epithet ("faggot") to refer to Bowron as in exhibit 32 from "me."

Exhibits 58 through 63 are MySpace messages sent to another of C.L.L.'s friends. In exhibits 58 through 60, the sender is "<<3 [C.'s] Profile Manager <<3." In exhibits 61 through 63, the sender is "Danny." In exhibit 58, the

sender complains of "that stupid picture of [C.L.L.] and that dork. It want be on there very long so you might as well save space on your profile and removed that stupid picture." He also mentions that C.L.L. "lost her voice-mail box," which is a reference to his practice of repeatedly filling up C.L.L.'s voice mailbox so no one else can leave her a voice-mail. In exhibit 59, <<3 [C.'s] Profile Manager <<3 notified the friend that "you might want to take that one picture off of your profile now. He is now out of her life forever and she has deleted all pictures of him from her profile." In his threats to kill C.L.L., Appellant mentioned these pictures of her and her boyfriend (exhibits 32 and 34 from "me"). In exhibits 60 (from <<3 [C.'s] Profile Manager <<3) and 61 (from "Danny"), the sender refers to putting C.L.L.'s personal information on the internet. He also threatens in exhibit 61 that "[i]f [C.L.L.] does anything stupid one day to totally make me mad that will happen and she is going to end up getting herself killed, since she wants to [be] stupid." These threats are similar to those from "me" in exhibits 31, 33, and 35.

In exhibit 62, Riley asked "Danny" "how is it that you keep getting [C.L.L.'s] info? You just need to leave her alone." This is an inquiry about Appellant's ability to get C.L.L.'s cell phone number even though she had it changed at least three times. "Danny" replied that "[t]hey are my business partners, they will give me anything I need." C.L.L. did not name anyone else who had been able to obtain her cell phone number from another source. Also, exhibit 73, an e-mail to C.L.L.'s mother that was purportedly sent by Appellant's "publicist," includes a similar, but more detailed, statement concerning Appellant's ability to obtain the information.

"Danny" then stated that "I'm not leaving [C.L.L.] alone until I see her, she

belongs to me." Riley responded, "uumm.. obviously not buddy!" "Danny" then repeated "[s]he don't belong to nobody else[.]" Appellant also informed C.L.L. that he told her mom "that you belong to me" (exhibit 20 displaying Appellant's telephone number), and "yap" told her that "I need you back in my life and I'm not going to let anyone take you away from me" (exhibit 73). The comment is also similar to Appellant's "publicist's" statement to C.L.L.'s mother in exhibit 73 that "[C.L.L.] is [Appellant's] girlfriend and always will be and she will come around one day and realize that she belongs to him."

Exhibit 64 is a MySpace message sent to another one of C.L.L.'s friends by "Mike." In this message, "Mike" mentions that he will have C.L.L.'s cell number very soon and that she will lose her voice mailbox as soon as he got the number." These are additional references to Appellant's ability to obtain C.L.L.'s cell phone number and his practice of keeping her voice mailbox full to prevent other people from leaving messages for her. "Mike" also informed the friend that he would not leave C.L.L. alone and that if C.L.L. got a restraining order, I might not be able to stop her, but "a BULLET can." This comment confirms that the sender is the subject of the restraining order that C.L.L. sought and obtained (exhibits 48 through 53), and the threat is similar to those Appellant previously made against C.L.L. (exhibits 31, 32, and 33 from "me" and exhibit 54 from <<3 [C.'s] Profile Manager <<3).

### Conclusion

Based upon our review of the challenged exhibits, our identification of certain characteristics that appear in multiple communications identifying different senders, and our application of Rule 901(b)(4), we hold that a reasonable fact finder could have found that the telephone number C.L.L.

attributed to Appellant was his telephone number. We further hold that a reasonable fact finder could find that Appellant sent the electronic communications attributed to him by the State and depicted in the challenged exhibits. Accordingly, the challenged exhibits are relevant as that term is defined in the rules of evidence and applicable case law, and the trial court did not abuse its discretion by admitting them. Appellant's third issue is overruled.

## EVIDENTIARY SUFFICIENCY

In his fourth and fifth issues, Appellant argues that the evidence is legally and factually insufficient to support his conviction.

### Standard of Review

The Texas Court of Criminal Appeals recently held that the *Jackson v. Virginia*[3] legal sufficiency standard is the only standard a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the state is required to prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex.Crim. App.2010) (plurality op.). Accordingly, we will not independently consider Appellant's argument that the evidence is factually insufficient to support the verdict.

Under this single sufficiency standard, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Brooks v. State*, 323 S.W.3d at 899. Under this standard, we do not sit as a thirteenth juror and may not substitute our judgment for that of the fact finder by reevaluating the weight and credibility of the evidence. *See Brooks*, 323 S.W.3d at 899. Instead,

we defer to the fact finder's responsibility to resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim.App.2007). However, the fact finder's resolution of conflicting evidence must be rational in light of the burden of proof. *See Brooks*, 323 S.W.3d at 899–900. It is our duty to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App.2007).

■ To support Appellant's conviction for stalking as alleged in the indictment, the State's evidence must establish that on more than one occasion and pursuant to the same scheme or course of conduct directed specifically at C.L.L., Appellant knowingly engaged in conduct that he knew or reasonably believed C.L.L. would regard as threatening bodily injury or death for her; caused her to be placed in fear of bodily injury and death; and would cause a reasonable person to fear bodily injury and death for herself. *See* TEX. PENAL CODE ANN. § 42.072(a)(1)(A), (2), (3)(A) (Vernon 2011). The indictment contained four specific allegations of stalking, alleging that Appellant threatened to put C.L.L.'s personal information on the internet; made repeated and threatening phone calls to her; threatened her via electronic communication; and threatened to kill her. When, as here, the fact finder returns a general guilty verdict on an indictment charging alternative theories of committing the same offense, the verdict stands if the evidence supports any of the theories charged. *Brooks v. State*, 990 S.W.2d 278, 283 (Tex.Crim.App.1999).

---

**3.** 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*Discussion*

Appellant first argues there is no evidence that he ever followed C.L.L. or was ever within the physical proximity of C.L.L. or of her family in a threatening way. More specifically, he argues that to be convicted of stalking, a person must have "engage[d] in 'conduct' that place[d] the accused within the physical proximity of the alleged victim which, as stated in the stalking statute, includes 'following the other person.'" *See* TEX. PENAL CODE ANN. § 42.072(a). For the reasons stated in our disposition of Appellant's sixth issue, which follows this section of the opinion, we are persuaded that "following" is not an element of stalking. *See Soto v. State*, No. 08–05–00227–CR, 2007 WL 4214399, at *3 (Tex.App.-El Paso Nov. 29, 2007, no pet.) (op., not designated for publication). For the same reasons, we are likewise persuaded, contrary to Appellant's argument, that the legislature's use of the term "following" does not imply that the required conduct must involve some type of physical presence. *See id.* Moreover, we have previously held that the "conduct" element of the stalking statute includes speech. *See Battles v. State*, 45 S.W.3d 694, 700 (Tex.App.-Tyler 2001, no pet.)

Appellant next argues that the text messages containing threats against C.L.L. were not credibly linked to Appellant and that the only evidence which could be credibly linked to Appellant were voice-mails, which did not threaten C.L.L. In reviewing the sufficiency of the evidence, we consider all of the evidence, admissible and inadmissible. *Johnson v. State*, 967 S.W.2d 410, 412 (Tex.Crim.App.1998). However, in this case, we have held that, contrary to Appellant's contention, a reasonable fact finder could find that Appellant sent the electronic communications attributed to him by the State.

Viewing the evidence in the light most favorable to the trial court's finding of guilt, the State presented testimony and other evidence at trial that describes a chilling pattern of irrational behavior directed at C.L.L. that persisted for approximately three years. During that time, Appellant sent C.L.L. thousands of text messages, e-mails, and other electronic communications; left thousands of voice-mails for her; kept her voice mailbox filled with messages so that no other person could leave a message for her; threatened to kill her; drove by her house; sent her messages that suggested she would eventually marry him; and, despite the existence of a restraining order, delivered a ring to one of C.L.L.'s friends, which she was asked to deliver to C.L.L.

Among the exhibits introduced by the State were photographs of four text messages sent by "me" to C.L.L. In two of these messages, "me" threatened to kill C.L.L. In two others, "me" informed C.L.L. that she was going to "get [herself] killed" and that "your life is going to be taken away from you one day." After receiving one of the messages, C.L.L. sent a text message to Appellant's telephone number asking him why he had threatened to kill her if he loved her so much. She then received five conciliatory e-mails from Appellant apologizing for his conduct. A Facebook conversation with C.L.L.'s brother shows that Appellant knew C.L.L. had filed a police report describing his conduct and obtained a restraining order against him.

C.L.L. testified about her attempts to avoid contact and communication with Appellant. She also testified that she was frightened by his conduct, that she reported his conduct to at least three law enforcement agencies, and succeeded in obtaining a restraining order against him. This evidence supports findings, beyond a

reasonable doubt, that (1) on at least four occasions, (2) pursuant to the same scheme or course of conduct directed specifically at C.L.L., (3) Appellant knowingly threatened by electronic communication to kill C.L.L., that (4) he knew or reasonably believed C.L.L. would regard as threatening bodily injury or death for her, (5) which caused C.L.L. to be placed in fear of bodily injury or death, (6) that would have placed a reasonable person in fear of bodily injury or death. Therefore, we hold that a rational fact finder could have found that the State proved each essential element of the offense beyond a reasonable doubt. Consequently, we need not address the State's remaining alternative theories. *See Brooks*, 990 S.W.2d at 283. We overrule Appellant's fourth and fifth issues.

### CONSTITUTIONALITY OF STALKING STATUTE

In his sixth issue, Appellant argues that the stalking statute is unconstitutional as applied to him. Appellant readily admits that this court and others have found the Texas stalking statute constitutional. He contends, however, that because there is no evidence that he maintained a threatening physical or visual proximity to C.L.L., the stalking statute is unconstitutional as applied to him.

Appellant acknowledges that in an "as applied" challenge, the reviewing court presumes the statute is valid and the legislature has not acted unreasonably. *Ex parte Granviel,* 561 S.W.2d 503, 511 (Tex. Crim.App.1978). Further, the statute must be upheld if any reasonable construction renders it constitutional. *McClain v. State,* 984 S.W.2d 700, 703 (Tex.App.-Texarkana 1998, pet. ref'd). But Appellant points out that the statute prohibits certain conduct where a person "knowingly engages in [that] conduct, including following the other person." *See* TEX. PENAL CODE ANN. § 42.072. Accordingly, he ar-

gues, "[t]here can be no other explanation for including the 'following' language other than to add a condition of physical presence to the required element of the statute." Thus, Appellant concludes, this "means that some threatening physical or visual proximity is an element of the crime and that the stalking statute cannot be constitutionally applied to a person whose conduct did not include such activity. In other words, texts and e-mails alone are not enough to be convicted of stalking under this statute."

Appellant cites no case supporting his interpretation of the statute. However, one court has held that "following" is not an element of stalking. *See Soto,* 2007 WL 4214399, at *3. In reaching its conclusion, the court reasoned that "including" is a term of enlargement and not an exclusive enumeration. *Id.* (citing TEX. GOV'T CODE ANN. § 311.005(13) (Vernon 2005)). Therefore, the legislature's use of "including" shows its intent that "following the other person" is not a requirement of stalking but rather an example of prohibited conduct. *Id.* We agree with the reasoning in *Soto.* Accordingly, we hold that a threatening visual or physical proximity is not an element of stalking. *See* TEX. PENAL CODE ANN. § 42.072. Thus, the trial court did not apply the stalking statute against Appellant in an unconstitutional manner. Appellant's sixth issue is overruled.

### DISPROPORTIONALITY OF PUNISHMENT

In his seventh issue, Appellant argues that his punishment was disproportionate to the seriousness of the alleged offense in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, Appellant contends that the trial court's imposition of six years of imprisonment based on the "tenuous evidence" admitted against

him constitutes cruel and unusual punishment. However, he made no timely objection to the trial court raising the issue of cruel and unusual punishment and has, therefore, waived the issue on appeal. *See Curry v. State,* 910 S.W.2d 490, 497 (Tex. Crim.App.1995) (failure to object to cruel and unusual punishment at trial waives federal constitutional challenge to sentence as cruel and unusual punishment); *Robertson v. State,* 245 S.W.3d 545, 548 (Tex. App.-Tyler 2007, pet. ref'd). But, even absent waiver, we conclude that the sentence of which Appellant complains does not constitute cruel and unusual punishment.

### Applicable Law

▓ The legislature is vested with the power to define crimes and prescribe penalties. *See Davis v. State,* 905 S.W.2d 655, 664 (Tex.App.-Texarkana 1995, pet. ref'd); *see also Simmons v. State,* 944 S.W.2d 11, 15 (Tex.App.-Tyler 1996, pet. ref'd). Courts have repeatedly held that punishment which falls within the limits prescribed by a valid statute is not excessive, cruel, or unusual. *See Harris v. State,* 656 S.W.2d 481, 486 (Tex.Crim.App.1983); *Jordan v. State,* 495 S.W.2d 949, 952 (Tex. Crim.App.1973); *Davis,* 905 S.W.2d at 664.

In the case at hand, Appellant was convicted of stalking. *See* TEX. PENAL CODE § 42.072(a). The crime as alleged was a third degree felony, with a punishment range for that offense of imprisonment for a term of not more than ten years or less than two years, and a possible fine not to exceed ten thousand dollars. TEX. PENAL CODE ANN. § 12.34 (Vernon 2011). Appellant was sentenced to six years of imprisonment. The sentence imposed by the trial court falls within the range set forth by the legislature. Therefore, the punishment is not prohibited as cruel, unusual, or excessive per se.

Nonetheless, Appellant contends that the United States Supreme Court has "recognized that the Eighth Amendment provides a limited proportionality component." *See Harmelin v. Michigan,* 501 U.S. 957, 984–86, 111 S.Ct. 2680, 2696–97, 115 L.Ed.2d 836 (1991). Consequently, he urges this court to perform the three part test originally set forth in *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Under this test, the proportionality of a sentence is evaluated by considering the (1) the gravity of the offense and the harshness of the penalty, (2) the sentences imposed on other criminals in the same jurisdiction, and (3) the sentences imposed for commission of the same crime in other jurisdictions. *Solem,* 463 U.S. at 292, 103 S.Ct. at 3011. The application of the *Solem* test has been modified by Texas courts and the Fifth Circuit Court of Appeals in light of the Supreme Court's decision in *Harmelin v. Michigan* to require a threshold determination that the sentence is grossly disproportionate to the crime before addressing the remaining elements. *See, e.g., McGruder v. Puckett,* 954 F.2d 313, 316 (5th Cir.), *cert. denied,* 506 U.S. 849, 113 S.Ct. 146, 121 L.Ed.2d 98 (1992); *see also Jackson v. State,* 989 S.W.2d 842, 845–46 (Tex.App.-Texarkana 1999, no pet.).

In determining whether Appellant's sentence is grossly disproportionate, we are guided by the holding in *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). In *Rummel,* the Supreme Court addressed the proportionality claim of an appellant who had received a mandatory life sentence under a prior version of the Texas habitual offender statute for a conviction of obtaining $120.75 by false pretenses. *Id.,* 445 U.S. at 266, 100 S.Ct. at 1135. A life sentence was imposed because the appellant also had two prior felony convictions-one for fraudulent use of

a credit card to obtain $80.00 worth of goods or services and the other for passing a forged check in the amount of $28.36. *Id.,* 445 U.S. at 266, 100 S.Ct. at 1134–35. After recognizing the legislative prerogative to classify offenses as felonies and, further, considering the purpose of the habitual offender statute, the court determined that the appellant's mandatory life did not constitute cruel and unusual punishment. *Rummel,* 445 U.S. at 285, 100 S.Ct. at 1145.

In the case at hand, the offense committed by Appellant—stalking a young woman for approximately three years—was more serious than those committed by the appellant in *Rummel,* and the six year sentence was far less severe than the life sentence upheld by the Supreme Court in *Rummel.* Thus, it follows that if the sentence in *Rummel* was not unconstitutionally disproportionate, then neither is the sentence assessed against Appellant here. Since we do not find the threshold test to be satisfied, we need not apply the remaining elements of the *Solem* test. Appellant's seventh and final issue is overruled.

### DISPOSITION

Having overruled Appellant's seven issues, we ***affirm*** the judgment of the trial court.