

FILED

Jul 30 2020, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Myriam Serrano
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael Scott Parker, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | July 30, 2020 <br><br> Court of Appeals Case No. 20A-CR-315 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Steven P. Meyer, Judge <br><br> Trial Court Cause No. 79D02-1903-F2-10 |

**Brown, Judge.**

[1] Michael Scott Parker appeals his convictions for dealing in methamphetamine as a level 3 felony and operating a motor vehicle without ever receiving a license as a class C misdemeanor. He argues the trial court abused its discretion in admitting certain Facebook messages. We affirm.

## Facts and Procedural History

[2] On March 19, 2019, Lafayette Police Sergeant Michael Zambon learned that Parker was wanted on a warrant from another jurisdiction and that he was possibly in the area. Lafayette Police Sergeant Brandon Withers obtained a photo of Parker from the Bureau of Motor Vehicles ("BMV") and asked Sergeant Zambon to use social media platforms to help locate Parker. Sergeant Zambon found Parker's profile on Facebook, which had Parker's name and date of birth. He ran Parker's name and date of birth through a national database, confirmed Parker was wanted on a warrant, and verified his physical appearance through the BMV.

[3] On March 20, 2019, Sergeant Zambon used a fictitious profile on Facebook under the name, Kris Johnson, to initiate a conversation with what appeared to be a profile under Parker's name by sending a message expressing an interest in selling a vehicle. Sergeant Zambon communicated with the user under Parker's name, discussed the vehicle and tattoos, and, at some point during the conversation, Sergeant Zambon received a message asking if he did "Go," which he knew to be a street name for methamphetamine. Transcript Volume III at 88. The user under Parker's profile solicited Sergeant Zambon to help sell methamphetamine, and they arranged to meet "at the area of 4th and Romig,

the Shell gas station down there" for that purpose and the vehicle inspection.[1] *Id.* at 91. The profile under Parker's name sent a message stating he lived on Broadway, and law enforcement identified an address for Parker on Broadway.

[4]     At about 1:00 a.m., Lafayette Police Officer Khoury Elias moved to a position where he could see "Romig Street in the 300 block" and the gas station. *Id.* at 126. Officer Elias observed that the lighting condition in that area was "pretty well lit." *Id.* at 127. Parker arrived at the Shell gas station at 4th and Romig in a vehicle and walked into the gas station. Officer Elias, who had become familiar with Parker's appearance by looking at his BMV photo, recognized and detained Parker. Officer Elias contacted dispatch and learned Parker had never been issued a driver's license. He searched Parker's pockets and removed several small bags of methamphetamine, a pencil sharpener containing small bags of methamphetamine, and a digital scale with white residue on it. Parker also had his cell phone with him, and Sergeant Zambon, who had maintained consistent communication through the Facebook messenger app until Parker was arrested, made a phone call from the Kris Johnson profile to Parker's profile, and Parker's phone rang.

---

[1] Sergeant Zambon testified that the Facebook messages referred to 239 South 4th Street as the address he provided and that the gas station was at 245 South 4th Street. State's Exhibit 5 which contains the Facebook messages reveals a meeting address of "239 s 4th" followed by a message stating: "Right next to the gas station." State's Exhibit 5. Another message from Sergeant Zambon under the Kris Johnson profile stated: "Park over at shell my downstairs neighbor will rat me to my landlord if I have a guest over." *Id.*

On March 20, 2019, the State charged Parker with: Count I, dealing in methamphetamine as a level 3 felony; Count II, possession of methamphetamine as a level 5 felony; Count III, operating a motor vehicle without ever receiving a license as a class C misdemeanor; Count IV, dealing in methamphetamine as a level 2 felony; and Count V, possession of methamphetamine as a level 4 felony. The State also alleged Parker was an habitual offender.

At the jury trial, the court admitted a photo of Parker from the BMV as State's Exhibit 1. Sergeant Withers testified that he went to Parker's residence on Broadway after clearing the scene at the gas station. Sergeant Zambon identified these exhibits as photos from Parker's Facebook profile, and Parker's counsel objected to State's Exhibits 2, 3, and 4 on the basis of authentication. During a sidebar, the prosecutor argued that "I am not offering this to prove the content of somebody's Facebook account, only to explain how Officer Zambon familiarized himself with the physical characteristics of the defendant." *Id.* at 79. After some discussion, the court overruled the objection "on the photos, because he's just identifying these photos that he used to later identify the Defendant." *Id.* at 84. The court admitted State's Exhibits 2, 3, and 4 over objection.

Sergeant Zambon testified that, once Parker was in custody, he was able to determine that the person depicted in the photographs in State's Exhibits 2, 3, and 4 matched Parker's description, and that "His name, date of birth and everything we confirmed." *Id.* at 85. He testified that the profile associated

with Parker sent a message stating he lived on Broadway. When asked if he knew the street on which Parker was living at that time, he answered: "I believe it was Broadway." *Id.* at 91. He testified he made a phone call from the Kris Johnson profile to Parker's profile. When asked if Parker's phone rang, he answered: "I believe it did." *Id.* at 93. He identified State's Exhibit 5 as the messages exchanged over Facebook Messenger. The Facebook messages contain a profile photo of Parker.

[8] Parker's counsel objected to the admission of the Facebook messages and argued that the messages should be authenticated. The court found that the evidence was "sufficient enough to establish to the Court that there's a reasonable probability that these messages did come from Mr. Michael Parker's Facebook account," and overruled the objection. *Id.* at 97.

[9] The jury found Parker guilty of Counts I, II, and III. Parker waived his right to a jury trial on the remaining charges. The court found Parker guilty of Counts IV and V and found him to be an habitual offender. The court found that Count II merged into Count I, vacated the convictions under Counts II, IV, and V, and sentenced Parker to concurrent sentences of twelve years for Count I and sixty days for Count III. The court enhanced the sentence for Count I by nine years for Parker's status as an habitual offender.

## *Discussion*

[10] The issue is whether the trial court abused its discretion in admitting the Facebook messages. Parker argues there was insufficient foundation to support

admission of the messages. Specifically, he asserts there was no evidence to demonstrate that he was the individual with whom Sergeant Zambon was communicating.

[11] The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). A trial court's ruling on the admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We do not reweigh the evidence; rather, we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant. *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016).

[12] Ind. Evidence Rule 901(a) provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(b) provides a list of examples of evidence that satisfy the requirement of subsection (a) and includes "[t]estimony that an item is what it is claimed to be, by a witness with knowledge" under subsection (b)(1), and "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" under subsection (b)(4)." Absolute proof of authenticity is not required. *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*. Rather, the proponent of the evidence must establish only a reasonable probability that the evidence is what it is claimed to be. *Pavlovich v. State*, 6 N.E.3d 969, 976 (Ind. Ct. App. 2014), *trans. denied*. Once this reasonable probability is shown, any

inconclusiveness regarding the exhibit's connection with the events at issue goes to the exhibit's weight, not its admissibility. *Id.* Additionally, authentication of an exhibit can be established by either direct or circumstantial evidence. *Id.*

[13] The language in Ind. Evidence Rule 901(b)(4) is similar to Federal Rule of Evidence 901(b)(4). In *Pavlovich*, this Court held:

> In what has been described as a "watershed" opinion with respect to authentication of text and email messages, the United States District Court of Maryland stated that "[t]his rule is one of the most frequently used to authenticate e-mail and other electronic records." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 546 (D. Md. 2007). Quoting the official commentary to this rule, the *Lorraine* court observed:
>
> > "[t]he characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety," including authenticating an exhibit by showing that it came from a "particular person by virtue of its disclosing knowledge of facts known peculiarly to him," or authenticating "by content and circumstances indicating it was in reply to a duly authenticated" document.
>
> *Id.* In other words, "[u]se of this rule often is characterized as authentication solely by 'circumstantial evidence.'" *Id.*
>
> The Texas Court of Criminal Appeals has noted the various ways in which text or email messages have been adequately authenticated as having been written by a party:
>
> > In some cases, the purported sender actually admitted to authorship, either in whole or in part, or was seen composing it. In others, the business records of an internet service provider or a cell phone company have shown that the message originated with the purported sender's

personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the computer or cell phone. Sometimes the communication has contained information that only the purported sender could be expected to know. Sometimes the purported sender has responded to an exchange of electronic communications in such a way as to indicate circumstantially that he was in fact the author of the particular communication, the authentication of which is in issue. And sometimes other circumstances, peculiar to the facts of the particular case, have sufficed to establish at least a prima facie showing of authentication.

*Tienda* [*v. State*, 358 S.W.3d 633, 640-641 (Tex. Crim. App. 2012)] (footnotes and citations omitted). *See also People v. Downin*, 357 Ill. App. 3d 193, 293 Ill. Dec. 371, 828 N.E.2d 341, 350-351 (2005) (holding emails were adequately authenticated as being written by defendant where victim personally knew defendant, had communicated previously with defendant through email, defendant was responsive to victim's email message, and email contained information that would have been known exclusively to him; although emails were adequately authenticated and admissible, ultimate question of authorship was for trier of fact to decide), *app. denied*; *Commonwealth v. Amaral*, 78 Mass. App. Ct. 671, 941 N.E.2d 1143, 1146-1147 (2011) (holding emails were adequately authenticated where in one, defendant indicated he would be at a certain place at a certain time and he in fact appeared at that place and time, and in another email he provided a telephone number, which investigating officer immediately called and defendant answered), *rev. denied*; *In re F.P.*, 878 A.2d 91, 95 (Pa. Super. Ct. 2005) (holding instant messages were adequately authenticated as having been written by defendant where defendant referred to his name and made threats and discussed events related to matters about which victim testified); *Manuel v. State*, 357 S.W.3d 66, 77-78 (Tex. App. 2011) (holding text messages were adequately

authenticated as being written by defendant where stalking victim recognized the number from which messages originated as belonging to defendant, and victim also received voice mail messages from number and she recognized the defendant's voice), *rev. refused*.

*Pavlovich*, 6 N.E.3d at 976-977 (footnote omitted).

[14] The record reveals that the trial court found the photo on the Facebook messages was similar to the BMV photo of Parker and "it appears to be the same individual in the photo of these Facebook texts." Transcript Volume III at 97. The profile under Parker's name sent a message stating he lived on Broadway, and law enforcement identified an address for Parker on Broadway. Further, the messages discussed methamphetamine, meeting at the Shell gas station at 4th and Romig, and Parker showed up at that location with methamphetamine. Parker was also found in possession of a phone, and Sergeant Zambon testified that he maintained consistent communication through the Facebook messenger app to the point of Parker's arrest. After the arrest, Sergeant Zambon made a phone call from the Kris Johnson profile to Parker's profile, and the phone found in Parker's possession rang. The Facebook messages show a missed call at 12:55 a.m. and states: "Michael missed your call." State's Exhibit 5. When asked if the reference in the Facebook messages to a missed call at 12:55 a.m. was the call to which he had referred earlier when he attempted to call Parker's Facebook profile, Sergeant Zambon answered: "That's correct. If you look at the messages underneath that, there's no profile photo indicating that the person read the message."

Transcript Volume III at 102. We conclude that the evidence was sufficient to authenticate the messages as being authored by Parker. Even if the evidence was not indisputable proof that Parker wrote the messages, such proof was not required. *See Fry*, 885 N.E.2d at 748. Any lingering doubts about whether Parker wrote the messages went to their evidentiary weight, not their admissibility. *See id.* Based upon the record, we cannot say the trial court abused its discretion in admitting the messages.

[15] For the foregoing reasons, we affirm Parker's convictions.

[16] Affirmed.

Robb, J., and Crone, J., concur.