AFFIRM; Opinion Filed October 10, 2012.



In The

# Court of Appeals
## Fifth District of Texas at Dallas

No. 05-11-00990-CR

WILLIE GLENN FRANKLIN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 2
Dallas County, Texas
Trial Court Cause No. F10-24956-I

# OPINION

Before Justices O'Neill, FitzGerald, and Lang-Miers
Opinion By Justice Lang-Miers

Willie Glenn Franklin pleaded not guilty to the offense of engaging in organized crime. A jury found him guilty and the trial court assessed punishment, enhanced by prior convictions, at sixteen years in the Institutional Division of the Texas Department of Criminal Justice. On appeal appellant argues that the evidence is insufficient to support the conviction and the trial court erred by admitting certain evidence. We affirm the trial court's judgment.

## BACKGROUND

The State argued that appellant engaged in organized crime by paying homeless people and others to go to banks and cash forged checks for him. To prove its allegations, the State offered the following evidence.

On July 20, 2010, appellant drove a van to Juanita Williams's apartment and picked up Williams and Diann Smith, who was staying with Williams. Three other people—Austin Hetler, Ted Howard, and Norris Mauldin—were either already in the van or appellant picked them up soon after. Appellant then drove to a park where they waited. Another vehicle drove up and appellant got out of the van and talked to someone from the other vehicle. Then appellant got back in the van and drove to a Bank of America in Garland. Appellant gave Hetler and Smith each a check and told them to go in the bank and cash the checks. The checks were drawn on the account of Metroplex Recycling Co. and Hetler and Smith were the respective payees. The teller assisting Smith wrote Smith's identifying information and imprinted Smith's fingerprint on the check, but then refused to cash the check. Smith took the check, went back to the van, and gave the check to appellant. Meanwhile the teller waiting on Hetler became suspicious and attempted to verify the check. Hetler became concerned because the teller was taking a long time and he left, leaving the check and his identification behind. He returned to the van without the check or cash.

Appellant then drove to United Central Bank in Garland and parked in a lot across the street. He gave Howard and Williams each a check and told them to go in the bank and cash them. Video surveillance at the bank showed both Howard and Williams in the bank, but Williams went to a teller window that was not open and eventually went to the foyer and waited. At some point, she left the bank and returned to the van. Howard attempted to cash his check, which was drawn on the account of Good Luck Burger. The teller became suspicious and called the owner of the company to verify it. The owner told the teller she had not authorized the check and did not have an employee named Howard. The teller's supervisor notified the bank's security officer, off-duty Garland police officer Willie Hawkins, and Officer Hawkins approached Howard about the check. The bank's video cameras showed Officer Hawkins dressed in a police uniform and talking to Howard. Howard immediately told the officer that the check "was not a good check and that he had been dropped off

-2-

by some people in the parking lot." Howard described the van that dropped him off. Officer Hawkins saw the van through the teller window and confirmed with Howard that it was the correct van. Officer Hawkins contacted dispatch. About that time, Howard jumped up and ran toward the door, falling into the glass foyer door and breaking it; he got up and kept running. Officer Hawkins chased Howard and used a taser on him outside the bank. As the officer was chasing Howard, he saw the van leaving the parking lot and called dispatch. Officer Hawkins arrested Howard at the scene.

Garland police officer Timothy Maas was nearby when he heard Officer Hawkins's radio call and responded. He stopped the van and ordered the driver and front seat passenger to get out. Other officers also responded to the call, and the entire stop was recorded on the camera in Officer Maas's patrol car. The driver and front seat passenger were later identified as appellant and Smith respectively. The other occupants of the van were later identified as Hetler, Williams, and Mauldin.

The police determined that the van was not covered by insurance and called to have it towed. Officer J.L. Galloway conducted an inventory search of the van and found five envelopes, two envelopes on the floorboard behind the driver's seat and three envelopes stuffed between the driver's seat and the center console. Each envelope had the handwritten name of one of the occupants of the van (except appellant) on the outside and contained five checks payable to the person whose name was on the envelope. The checks were drawn on the accounts of the following businesses: Good Luck Burger; Metroplex Recycling Co.; Messer, Campbell & Brady, LLP; Medallion Electric; and Andreola Terrazzo & Restoration, Inc. The check Hetler presented to Bank of America and the check Howard presented to United Central Bank were not in the envelopes because those checks were left at the banks. All the checks were dated July 19, the day before these incidents, and all were just under $1,000.

The police arrested all the occupants of the van. The video of the stop showed appellant holding a cell phone and appearing to push "buttons" before he was arrested. The police placed the

—3—

cell phone with appellant's other property when he was booked in jail. The detective investigating the crime got a search warrant for the cell phone and took the phone to the FBI for analysis. At trial he identified three text messages retrieved from the cell phone: "three people off at the bridge before ten" sent the evening of July 17; "Im on my way 2 the bridge" sent the morning of July 8; and "Whats the date on the check? Skybox" received the evening of July 19.

At trial, the State presented the testimony of employees from both banks, the owners of the entities upon whose accounts the checks had been drawn, and the officers involved in the arrests and investigation. It also presented testimony from accomplice Smith.

Smith testified that she stayed at Williams's house on July 19, 2010. While she was there, a man came by Williams's apartment and took information from Smith's driver's license. On the morning of July 20, appellant came to Williams's apartment in a van and Smith and Williams got in the van. Smith said she had not met appellant until that morning. Appellant drove to a park where they waited. Smith, who was sitting in the back of the van, heard a car drive up. Appellant got out of the van and talked to someone. Appellant got back in the van and drove to a Bank of America in Garland. Appellant handed Smith and "a white guy" each a check and Smith and the "white guy" went in the bank to cash the checks. Smith testified that she was the payee on the check appellant gave her, that her identifying information was printed on the check, and that it was drawn on the account of Metroplex Recycling Co. When asked what she was supposed to say if anyone asked why Metroplex Recycling Co. gave her the check she said, "I guess to make like I worked there." Smith heard some of the people in the van say they would get $100 for cashing the checks. Smith said the Bank of America teller had Smith put her fingerprint on the check. The teller then put the check "through the thing, and she typed something in" and the check did not "go through." The teller told Smith "to take it back where I got it from" because "it wasn't in the system or something." Smith took the check, left the bank, went back to the van, and gave the check to appellant. They waited

–4–

about twenty minutes and the "white guy" came back to the van. He did not have any money, either, and "said he left it – he left – ran out and left his ID" because "they went to the back on him[.]"

Smith testified that appellant then drove them to United Central Bank. Appellant gave Williams and a different man each a check, and Williams and the man went inside the bank. Smith said appellant parked the van across the street where he could see the bank. She said she was in the back seat of the van, but she got hot and moved to the front passenger seat. She saw Williams come out of the bank first and get in the van. About five or ten minutes later "that other guy came out, but he was running [and] the police was running behind, and he had tased him . . . ." Smith said when they saw that, appellant cranked up the van and started leaving the parking lot. She said the police stopped the van and told her and appellant to get out. She was arrested and pleaded guilty in exchange for four years' community supervision.

The State showed Smith other checks that were payable to her and had her identifying information printed on them. She testified that she had never seen those checks before. She also said she did not see any checks when she was sitting in the front seat, she did not put the envelopes between the driver's seat and the console, and she did not see who put the checks there. When asked whether appellant had "any equipment [in the van] that he was writing these checks on or making these checks" she said no.

Also during the guilt-innocence stage of trial, the State offered, over appellant's objections, evidence that appellant was convicted of engaging in organized crime/forgery in Rockwall County. The evidence of the prior conviction showed that appellant was charged with driving others to banks to cash forged checks in Rockwall County, that appellant committed the earlier offense less than two months before the offense on trial, and that he pleaded guilty.

–5–

In issue one, appellant argues that the evidence is insufficient to support the conviction because there is no evidence corroborating Smith's accomplice testimony or tying him to the offense. We disagree.

A person commits the offense of engaging in organized crime if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination the person commits or conspires to commit forgery. *See* TEX. PENAL CODE ANN. § 71.02(a)(1) (West Supp. 2012). A person commits forgery if he forges a writing with intent to defraud or harm another. *Id.* § 32.21(b) (West 2011). A person forges a writing if he possesses a writing that is altered, made, completed, executed, or authenticated so that it purports to be the act of another who did not authorize the act. *Id.* § 32.21(a)(1).

### Corroboration of Accomplice Witness Testimony

Texas law requires the State to corroborate accomplice witness testimony with other, non-accomplice evidence tending to connect the defendant to the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). The corroboration is not sufficient if it merely shows an offense was committed; the evidence must tend to connect the defendant to the commission of the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14; *Smith*, 332 S.W.3d at 439.

In reviewing a challenge to the sufficiency of non-accomplice evidence, we must determine whether the direct and circumstantial non-accomplice evidence shows that rational jurors could have found it sufficiently tended to connect the accused to the offense. *Smith*, 332 S.W.3d at 442. To do this, we "consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense." *Id.* And when there is a conflict in the views of the evidence, we must defer to the jury's resolution of the evidence. *Id.* The non-accomplice evidence need not be sufficient

–6–

to establish guilt; "proof that an accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Id.* at 442–43 (quoting *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993)).

Appellant argues that there were only two people "capable of corroborating [his] involvement" in the offense—Officers Maas and Galloway. And he contends their testimony shows only the commission of the offense. To the extent appellant argues that only witness testimony can corroborate an accomplice's testimony, he cites no authority to support that argument. We look to all the evidence—testimonial or otherwise—in determining whether an accomplice's testimony was corroborated.

Smith testified that a man came by Williams's apartment and took her identification information to put on checks. Five of the checks found in the van had Smith's identification information on them. Additionally, Smith's testimony about her and Hetler's attempts to cash checks at the Bank of America was corroborated by the Bank of America teller and evidence found inside the van. The teller identified Hetler as the person who tried to cash a check drawn on the account of Metroplex Recycling Co. The police also found a check payable to Smith in the van drawn on the account of Metroplex Recycling Co. It was endorsed by Smith on the back and had her fingerprint imprinted and identification information on the front, just as Smith testified. And Smith's testimony that Hetler returned to the van without his check and identification was corroborated by the Bank of America employees who testified that Hetler left the bank without the check or his identification and the bank gave those documents to the police. And Hetler was in the van when it was stopped.

Smith's testimony about Williams's and Howard's attempts to cash checks at United Central Bank was corroborated by the testimony of the United Central Bank teller, Officer Hawkins, Officer Maas, video surveillance, and evidence found in the van. The bank's video surveillance showed

Howard and Williams entering the bank and approaching the teller windows. It then shows Williams in the foyer area and Howard at the teller station. This evidence corroborates Smith's testimony that Williams and a different man went in the United Central Bank to cash checks. Officer Hawkins testified that he chased Howard and used his taser on him outside the bank. This corroborates Smith's testimony that she saw the man running out of the bank and being chased and "tased" by the police. Officer Hawkins also testified that he saw the van leaving as Howard ran toward it. This testimony corroborates Smith's testimony that appellant drove off when he saw the officer chasing Howard. When the van was stopped, appellant was driving and Smith was in the front seat, just as Smith testified. And Williams was in the van, which corroborates Smith's testimony that Williams returned to the van before Howard ran out of the bank.

Additionally, the police found checks in the van showing the payees as Smith, Hetler, Howard, Williams, and Mauldin. The owners of the businesses on whose accounts those checks were drawn testified that the checks were forgeries.

This non-accomplice evidence places appellant at or near the scene of the crime at or about the time of its commission under suspicious circumstances—appellant was driving the van; Hetler, who had attempted to pass a forged check earlier at Bank of America, was in the van; Williams, who came in United Central Bank with Howard, was also in the van; and numerous forged checks payable to the occupants of the van were in envelopes with the van occupants' names written on them. We conclude that the non-accomplice testimony tends to connect appellant to the offense and that Smith's accomplice testimony was corroborated.

### Evidence Supporting the Conviction

Appellant also contends that "there is absolutely zero evidence in the record in support of Appellant's involvement outside of driving the van[.]"

When an appellant challenges the sufficiency of the evidence to support a conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Id*. If the evidence is conflicting, we "'presume that the factfinder resolved the conflicts in favor of the prosecution' and defer to that determination." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). This standard is the same for both direct and circumstantial evidence. *Id*.

Appellant argues that "not a single employee of any of the Banks involved, and not a single business owner whose account was compromised could tie [him] to the creation or signing of the checks." He also argues that the State did not present any evidence about why he would have chosen those specific accounts or that he passed the checks.

The penal code provides several definitions of forgery, only one of which involves actually making or executing a writing. *See* TEX. PENAL CODE ANN. § 32.21(a). The definition also includes possessing a writing that purports to be the act of another who did not authorize the act with the intent to utter it. *See id*. § 32.21(a)(1). Smith testified that appellant gave the checks to her and the others to cash. This is some evidence that appellant possessed the forged checks.

Appellant also contends that because Officer Hawkins described the van to dispatch as brown in color and the police stopped a black and silver van, the evidence is insufficient to show that the police stopped the right van. But regardless of the actual color of the van, Officer Hawkins testified that the van the police stopped was the same van he saw in the parking lot. And appellant was driving and Smith was in the front seat, just as Smith testified. Williams, who had entered the United Central Bank with Howard, was also in the van.

Additionally, appellant's cell phone contained text messages about going to "the bridge" and dropping people off at "the bridge." The evidence showed that some of the accomplices lived at a homeless shelter called The Bridge. Another message, received the night before the offense on trial, asked about "the date on the check." There was also evidence that appellant pleaded guilty to committing the same offense under very similar facts in Rockwall County less than two months before this offense.

Having viewed the evidence in the light most favorable to the verdict, we conclude that it is sufficient to support the conviction. We resolve issue one against appellant.

## ADMISSION OF EVIDENCE

Appellant raises two issues on appeal involving the admission of evidence. One issue concerns the admission of the text messages and the other involves the admission of his prior conviction in Rockwall County.

### Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). As long as the trial court's ruling is "within the zone of reasonable disagreement," we will not disturb the ruling. *Id.* (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

### Text Messages

In issue two, appellant argues that the trial court erred by admitting the text messages. He contends that the State proved only that he possessed the cell phone from which the text messages were retrieved and did not authenticate the text messages by showing that he was the person who sent or received the messages.

Electronic evidence such as text messages must be authenticated to be admissible. *See* TEX. R. EVID. 901(a); *Tienda*, 358 S.W.3d at 638. Evidence may be authenticated in several ways,

including by direct testimony from a witness or by circumstantial evidence. *See Tienda*, 358 S.W.3d at 638; *Manuel v. State*, 357 S.W.3d 66, 74–75 (Tex. App.—Tyler 2011, pet. ref'd). "[C]ellular phone text messages have all been admitted into evidence when found to be sufficiently linked to the purported author so as to justify submission to the jury for its ultimate determination of authenticity." *Tienda*, 358 S.W.3d at 639. Admissibility in each case turns on the peculiar facts of that case. *Id.* at 641. The trial court "need not be persuaded that the proffered evidence is authentic. The preliminary question for the trial court to decide is simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic." *Id.* at 638.

In this case, the State presented evidence that appellant had a cell phone in his hand when the police stopped the van. The cell phone was taken from appellant when he was arrested and placed with his other property when he was booked in jail. Detective Williams testified that he obtained a search warrant for that phone and took the phone to the FBI for analysis. Although there was no evidence the cell phone was "registered" to appellant, the evidence at trial showed that the cell phone analyzed by the FBI was the same cell phone appellant had at the time of his arrest.

The senior forensic examiner for the FBI testified that he was able to retrieve contacts, call histories, and audio and text messages from the phone. Of the sixty text messages he found on the phone, the State offered three in evidence: two included the words "the bridge" in the messages. One of those text messages was sent the evening of July 17 and stated "three people off at the bridge before ten" and the other was sent the morning of July 8 and stated "Im on my way 2 the bridge." The evidence showed that this offense was committed on July 20 and that some of the accomplices lived at The Bridge homeless shelter. The third text message was received by the cell phone the evening before the forgery attempts and stated, "Whats the date on the check? Skybox." Although the forensic examiner testified that he did not know who actually sent or received the text messages,

−11−

we conclude that the circumstances of this case are sufficient to allow a jury reasonably to find that appellant sent and received the messages: appellant possessed the phone containing the messages, appellant was seen using the phone at the time of his arrest, two of the messages contained information related to the accomplices occupying the van, and one of the messages asked about the date on a check. Based on this evidence, we conclude that the trial court did not abuse its discretion by admitting the text messages in evidence. *See Tienda*, 358 S.W.3d at 638, 645. We resolve issue two against appellant.

## Evidence of Prior Conviction

In issue three, appellant argues that the trial court erred by admitting evidence of his prior conviction in Rockwall County during the guilt-innocence stage of trial over his relevance and Rule 403 objections.

Evidence is relevant if it makes the existence of a material fact more or less probable than without the evidence. *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). Evidence of other crimes, wrongs, or acts, however, is not admissible to prove the character of a person in order to show the person acted in conformity with bad character. TEX. R. EVID. 404(b); *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). But it may be admissible for other purposes, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b); *De La Paz*, 279 S.W.3d at 343. Even if evidence is relevant, it may be excluded if its relevance is outweighed by the danger that the evidence will unfairly prejudice, confuse, or mislead the jury, or if its admission will result in undue delay, or the evidence is needlessly cumulative. TEX. R. EVID. 403. Rule 403 favors the admission of relevant evidence, and the presumption is that relevant evidence is more probative than prejudicial. *Montgomery*, 810 S.W.2d at 389.

-12-

The trial court determines whether evidence of other crimes has relevance apart from character conformity. *See* TEX. R. EVID. 404(b). The court also conducts a balancing test to determine whether the probative value of the relevant evidence is substantially outweighed by any "countervailing considerations" in Rule 403. *See Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). The trial court

> must balance: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). The trial court is presumed to have weighed these factors if it overruled the Rule 403 objection. *See Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997).

In this case the State offered evidence outside the jury's presence that appellant pleaded guilty to an offense in Rockwall County that was very similar to the offense on trial—engaging in organized crime by driving accomplices to various banks to pass forged checks. The judgment showed that appellant committed the offense one month and sixteen days before the offense in this case. Appellant objected that the State was offering the prior conviction for the sole purpose of showing that appellant "is a bad person," that he had not opened the door to the admission of extraneous offense evidence, and that "the probative value is outweighed by the prejudicial effect[.]" The prosecutor responded by arguing, among other things, "Well, this evidence is proper evidence of his knowledge[,] of his intent, of his common plan or scheme, his absence of mistake." The trial court overruled appellant's objections and the State presented the evidence to the jury.

–13–

On appeal appellant contends that the trial court erred by admitting the prior conviction during the guilt-innocence stage because he "had yet to provide any testimony, and had not by means of cross-examination raised any implicit defense, which would allow for the usage of [his] prior criminal history as evidence against him." Appellant cites a case from this Court, *Carter v. State*, 145 S.W.3d 702 (Tex. App.—Dallas 2006, pet. ref'd), for the proposition that when there is no compelling need for the extraneous offense evidence, its admission is not justified. *See id.* at 708–09. In his argument section, appellant states, "[t]he State's proffered rationale for the admissibility of the testimony was to show absence of mistake. No testimony during the course of the trial alleged, or even implied, that [he] intended to raise a mistake of fact defense." But appellant ignores the other reasons the State proffered when offering the evidence, that is, to show appellant's intent, knowledge, and common plan or scheme. We stated in *Carter* that "[e]xtraneous offense evidence is relevant if it logically makes elemental facts, such as intent or knowledge, more or less probable[.]" *Id.* at 708. We also said that "[e]vidence of extraneous offenses may be admissible to prove scienter, but only where intent or guilty knowledge is an essential element of the State's case and cannot be inferred from the act itself." *Id.*

Intent or guilty knowledge is an essential element of forgery and engaging in organized crime. *See* TEX. PENAL CODE ANN. §§ 32.21(b) (forgery), 71.02(a)(1) (engaging in organized crime). And intent in a forgery case cannot be inferred from the act itself. *Parks v. State*, 746 S.W.2d 738, 740 (Tex. Crim. App. 1987). The Texas Court of Criminal Appeals has said:

> This Court has wisely held that intent or guilty knowledge cannot be inferred from the mere passing of a forged instrument. Indeed, to hold otherwise would create the danger that the unknowing and accidental passing of a forged instrument could effectively become a strict liability offense. The issue of intent is of such overriding importance in a case of forgery that it effectively becomes the focus of the State's case. Establishing intent in such cases is so crucial and so difficult to do that, as a practical matter, evidence of extraneous offenses is nearly always admissible. While it is hypothetically possible that a case of forgery could be established by direct evidence, such as eyewitness testimony, most cases of forgery rest on circumstantial

-14-

evidence. In the vast majority of such cases, the probative value of evidence of extraneous offenses will inevitably outweigh its prejudicial effect.

*Id.* (internal citations omitted); *De La Paz*, 279 S.W.3d at 350 n.46 (quoting *Parks*, 746 S.W.2d at 740).

The State did not have direct evidence of appellant's intent or guilty knowledge in this case. And the offense on trial and the prior conviction were very similar: both involved forged checks, both involved passing those forged checks at banks, and both involved appellant driving others to those banks to utter the forged checks. The evidence showed that appellant committed the earlier offense less than two months before the offense on trial. And it was undisputed that appellant pleaded guilty to the earlier offense.

Because intent to commit forgery cannot be inferred here, the prior conviction showing strikingly similar facts made the existence of a material fact, that is, whether appellant possessed forged checks with the intent to defraud or harm another, more probable. *See Parks*, 746 S.W.2d at 739–41. And the State's need for the evidence of the prior conviction was compelling because there was no direct evidence of appellant's intent or guilty knowledge. *Cf. Carter*, 145 S.W.3d at 708–09.

Additionally, during opening statement, appellant told the jury

Ladies and gentlemen, it's true that all those people that the prosecutor said went into the banks and tried to cash checks that they did go in and try to cash checks and were – some of them – one of them was arrested on the scene, but those are not [appellant]. None of those checks were recovered from [appellant]. [Appellant] didn't know any of these people, and they didn't know him. And so he wasn't part of the conspiracy. He wasn't going to benefit from any of those checks being cashed. And you will hear testimony from the State's witnesses that contradicts everything that the prosecutor is trying to tell you about [appellant] being involved.

Appellant's opening statement established his defensive theories of lack of intent, lack of knowledge, and mistake or accident. *See Powell v. State*, 63 S.W.3d 435, 438–39 (Tex. Crim. App. 2001). He also cross-examined many of the witnesses who confirmed that appellant was not seen in any of the banks and his name was not on any of the checks. One of the officers also confirmed

–15–

on cross-examination that when appellant was arrested he denied owning any of "that stuff" found in the van. We conclude the prior conviction was admissible to rebut appellant's defensive theories. *See id.*

Appellant argues that even if the prior conviction was relevant, the trial court should have sustained his Rule 403 objection. Appellant's entire Rule 403 argument on appeal states:

> This information was highly prejudicial to the Appellant and was not outweighed by any probative value and led the jury to find the Appellant guilty which deprived him of any potential for a fair and impartial viewing of the limited evidence of his guilt.

We conclude that appellant has not demonstrated the trial court acted outside the zone of reasonable disagreement by balancing the factors in favor of admissibility. *See Williams v. State*, 301 S.W.3d 675, 686 n.5 (Tex. Crim. App. 2009) (concluding that appellant's one-sentence reference to Rule 403 did not adequately brief that issue for review). We resolve issue three against appellant.

## CONCLUSION

We affirm the trial court's judgment.

ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
110990F.U05